CITIZENS AND SOUTHERN CORPORATION AND
SUBSIDIARIES, PETITIONER v. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 35465-86.        Filed September 6, 1988.

*Sidney O. Smith, Jr., Philip C. Cook, Steven M. Collins, Terence J. Greene, Martin D. Ginsburg, Kenneth W. Gideon, John F. Coverdale,* and *Timothy J. Peaden,* for the petitioner.

*Anne O. Hintermeister, Wendy Sands,* and *Patricia A. Donahue,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income taxes as follows:

| Taxable year | Deficiency |
|---|---|
| 1979 | $433,750 |
| 1980 | 5,415,133 |
| 1981 | 44,441 |
| 1982 | 1,115,224 |

The issues for our decision are: (1) Whether petitioner is entitled to a depreciation deduction under section 167 [1] with respect to the deposit base acquired in the purchase of nine banks; and (2) if so, whether petitioner is entitled to a depreciation deduction for the taxable year 1982 in an amount equal to the present value at the acquisition dates of the projected income stream attributable to the acquired core deposits for that taxable year. [2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference.

Petitioner is a Georgia corporation and its principal place of business was Atlanta, Georgia, at the time it filed its petition in this case. Petitioner filed consolidated Federal income tax returns for the taxable years 1979, 1980, 1981, and 1982 with the Internal Revenue Service Center in Atlanta, Georgia. Petitioner's principal business is commercial banking.

In 1928, the Citizens & Southern National Bank formed a wholly owned subsidiary, Citizens & Southern Holding Co., later renamed Citizens & Southern Georgia Corp. As of December 31, 1980, the Citizens & Southern National Bank conducted banking operations in Georgia through 109 branch banking offices located in Athens (4), metropolitan Atlanta (69), Augusta (10), Macon (11), Savannah (12), and Valdosta (3), and the Citizens & Southern Georgia Corp. had a majority interest in five State-chartered banks in Georgia

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the relevant years.

[2]Pursuant to a joint motion of the parties, which was granted, these issues, along with several tax credit issues were severed for purposes of trial, briefing, and opinion. The parties settled the tax credit issues. The remaining issue, the "Brazilian Foreign Tax Credit Issue," was consolidated with the identical issue in *Continental Illinois Corp. v. Commissioner*, for purposes of trial, briefing, and opinion and was decided in that consolidated case which is reported at T.C. Memo. 1988-318.

having 19 banking offices located in Albany (7), Dublin (4), LaGrange (3), Newnan (3), and Thomaston (2). Citizens & Southern Georgia Corp. also had international banking offices located in Atlanta, Savannah, and Nassau, and "Edge Act offices" in Miami and New Orleans, and corporate regional service offices in New York, Chicago, and Los Angeles, and international service offices in Brazil, Peru, Costa Rica, Colombia, Singapore, and Guatemala. On December 31, 1980, Citizens & Southern National Bank and three wholly owned subsidiary banks of Citizens & Southern Georgia Corp. were merged into a new entity that was named the Citizens & Southern National Bank, whereupon Citizens & Southern Georgia Corp. became the parent entity. On May 20, 1986, Citizens & Southern Georgia Corp. was renamed the Citizens & Southern Corp. Petitioner and its predecessors shall hereinafter collectively be referred to as petitioner.

Petitioner uses the term "deposit base" to describe the intangible asset that arises in a purchase transaction representing the present value of the future stream of income to be derived from employing the purchased core deposits of a bank. Petitioner uses the term "core deposits" principally to refer to deposit transaction accounts (DTA accounts), regular savings accounts, and time deposit open accounts (TDOA accounts). In 1981 and 1982, DTA accounts included regular checking accounts and NOW accounts but did not include any market investment accounts. Regular savings accounts are interest-bearing accounts with no checking privileges and no restrictions on the timing of withdrawals. Petitioner's TDOA accounts are interest-bearing consumer savings accounts similar to petitioner's regular savings accounts, except for some restrictions on the timing of withdrawals. The stated nominal rate and effective rate of interest paid on TDOA accounts was approximately the same as that paid on regular savings accounts. TDOA accounts, which did not pay market rates of interest, were perceived by depositors as savings accumulation accounts rather than investment accounts.

Core deposits are a relatively low-cost source of funds, reasonably stable over time, and relatively insensitive to interest rate changes. A bank typically invests the funds

from deposits in loans and other income-producing assets, and receives fees for services rendered to its depositors. A bank also incurs expenses in establishing, processing, and maintaining deposit accounts. The excess of the income generated over the associated costs represents the profit attributable to core deposits. Core deposits are an important factor contributing to the profitability of a commercial bank. If a bank does not have sufficient core deposits, it must fund its investments through higher-cost deposits and other sources of funding, thereby reducing net income.

Deposit accounts do not remain with a bank indefinitely but eventually close because depositors' circumstances change over time. An account may close because of marriage, divorce, relocation, death, or dissatisfaction with the services offered by the bank. Newly established banks may offer greater convenience or low introductory service charges. A business account may close because of business failure, reorganization, or merger.

Beginning in the late 1950's, petitioner developed a close relationship with a number of banks located throughout Georgia referred to as "correspondent associates." The correspondent associates used the data processing and banking services of petitioner and in most cases used a name that included the "Citizens and Southern" name. The correspondent associates normally used petitioner's logogram, with the consent of petitioner.

During 1981 and 1982, petitioner acquired nine of these correspondent associates, collectively referred to as the "Acquired Banks." The Acquired Banks were: (1) the Citizens & Southern Bank of Cobb County (the Cobb Bank); (2) the Citizens & Southern Bank of Clayton County (the Clayton Bank); the Citizens & Southern Bank of Henry County (the Henry Bank); (4) the Citizens & Southern Bank of Houston County (the Houston Bank); (5) the Citizens & Southern Bank of Colquitt County (the Colquitt Bank); (6) the Citizens & Southern Bank of Dalton (the Dalton Bank); (7) the Citizens & Southern Bank of Hart County (the Hart Bank); (8) the Citizens & Southern Bank of Jackson (the Jackson Bank); and (9) the Citizens & Southern Bank of Thomas County (the Thomas Bank). The Acquired Banks expended and deducted amounts for advertising, marketing,

business development, promotion, salaries, and other expenses connected with attracting and retaining customers in the taxable years prior to their acquisition. The business of the Acquired Banks was conducted substantially in the same manner as before the acquisitions. To the best of petitioner's knowledge, no employees of the Acquired Banks were discharged or resigned as a result of the acquisitions.

To establish offering prices for the Acquired Banks, petitioner relied upon a computerized acquisition model. Petitioner's corporate finance department reviewed material prepared by petitioner's economics department concerning the county in which the bank was located and reviewed 5 years of historical financial information on the bank, identifying specific strengths and weaknesses. All of this background data was used to derive the assumptions used in the acquisition model that projected the bank's future financial performance. The purpose of projecting future financial performance of a bank was to determine a future dividend stream which, when discounted to present value, would determine the value of the bank. The projections were based upon balance sheet growth, and an integral part of these assumptions was that the balance sheet growth was going to continue to be funded to a large extent by core deposits.

On the computerized acquisition model runs, core deposits were listed separately. The acquisition model took into account the interest expense and servicing costs related to maintaining core deposits. In general, the higher the level of core deposits as opposed to more expensive sources of funds, the higher the value produced by the acquisition model. The acquisition model valued the income stream generated by predicted deposit levels including the initial level of deposits as well as future growth in deposits, but did not separately compute a value for deposit base or any of the assets shown on the balance sheets of the banks.

In a sensitivity analysis of the acquisition model for the Cobb Bank, petitioner replaced the acquired core deposits that were projected to survive in each future year with more expensive money market liabilities. This reduced the recommended purchase price of the model from $21.1

million [3] to \$5.6 million, a reduction of \$15.5 million.

Petitioner acquired the Acquired Banks in taxable mergers or stock purchase transactions that constituted taxable asset purchases for Federal income tax purposes (or, in the case of the Dalton Bank, a deemed asset purchase under section 338) pursuant to which petitioner obtained a cost basis in the assets of the Acquired Banks. The effective dates of the acquisitions and the purchase prices paid by petitioner, including cash, notes, and assumed liabilities were as follows:

| Acquired Bank | Acquisition date | Purchase price |
|---|---|---|
| Cobb Bank | 12/31/81 | \$113,303,520 |
| Clayton Bank | 12/31/81 | 68,112,093 |
| Henry Bank | 12/31/81 | 15,243,418 |
| Houston Bank | 5/31/82 | 47,746,527 |
| Colquitt Bank | 8/31/82 | 51,758,214 |
| Dalton Bank | 9/01/82 | 14,466,988 |
| Hart Bank | 10/31/82 | 58,761,030 |
| Jackson Bank | 10/31/82 | 33,019,189 |
| Thomas Bank | 10/31/82 | 59,224,045 |
| Total | | 461,635,024 |

Petitioner allocated the purchase price of the Acquired Banks in accordance with generally accepted accounting principles. It determined the fair market value of the loan portfolios and securities portfolios, in the case of securities for which published market prices were not available, by discounting the expected cash-flows from the loans and securities to present value at the valuation date at a current market rate of interest. The fair market value of the acquired loan and securities portfolios on the dates of acquisition was generally less than the book value of the loan and securities portfolios because of the high level of interest rates prevailing at the time of the acquisitions.

Petitioner valued the intangible assets at their cost and identified deposit base as a separately identifiable intangible asset. Petitioner determined the cost of goodwill under the residual method as the excess of the purchase price over that portion of the purchase price that had been allocated to the tangible assets and the identifiable intangible assets. Petitioner allocated the following amounts to deposit base and goodwill/going-concern value:

---

[3]This purchase price does not include the assumption of liabilities.

| Acquired Bank | Deposit base [4] | Goodwill/going-concern value |
|---|---|---|
| Cobb Bank | $14,463,683 | $4,086,788 |
| Clayton Bank | 7,520,504 | 2,303,188 |
| Henry Bank | 1,095,805 | 936,006 |
| Houston Bank | 5,134,828 | - - - |
| Colquitt Bank | 3,756,205 | 1,168,215 |
| Dalton Bank | 667,411 | - - - |
| Hart Bank | 3,530,415 | 1,446,579 |
| Jackson Bank | 1,930,826 | 492,148 |
| Thomas Bank | 3,685,393 | 63,448 |
| Total | 41,785,070 | 10,496,372 |

Petitioner's methodology for valuing deposit base was developed by Kenneth McCollum (McCollum), vice president and senior project accountant in the accounting policy and research department of petitioner. He developed the methodology by studying the accounting literature, reviewing studies performed by others, and applying his experience valuing loan portfolios and purchased mortgage servicing rights. Prior to joining the accounting policy and research department, McCollum was the accounting systems manager for petitioner's mortgage banking subsidiary. In that capacity, McCollum developed a model for valuing purchased mortgage servicing rights and performed several valuations using that model.

Petitioner separately valued the DTA accounts, regular savings accounts, and TDOA accounts of each of the Acquired Banks. Petitioner's deposit base valuation methodology analyzed the accounts that existed at the valuation date, based upon the market information available at that time and the market conditions at that time. Petitioner's deposit base valuation was completed prior to the acquisition dates.

The first step in petitioner's deposit base valuation methodology was to determine the survival probabilities of the accounts, based upon an examination of the rate of closure of the deposit accounts. Information concerning the deposit accounts at the Acquired Banks was obtained from the computerized deposit system masterfiles in which the

---

[4]The parties stipulated to these figures. However, the supporting documents for the stipulation show that $14,463,648 and $1,095,770 were allocated to the deposit bases of the Cobb Bank and the Henry Bank, respectively. This discrepancy is immaterial to the resolution of the issues before us.

records of those accounts were maintained. Because petitioner furnished data processing services to the Acquired Banks, the masterfiles were physically in the possession of petitioner. The information on those files was used by petitioner with the permission of the management of the Acquired Banks. The deposit system masterfile included extensive information concerning each account, including the depositor's name and address, the account number, the status of the account, the date it was opened, the last activity date, and the balance of the account.

Petitioner began retaining copies of the monthend deposit system masterfiles in August 1981 for the purpose of performing valuation studies. At the time of the Cobb, Clayton, and Henry valuations in December 1981, the four masterfiles for the months of August through November 1981 were available, an observation period of 3 months. A greater number of masterfiles were available for later acquisitions, up to a total of 14 masterfiles for the Dalton, Hart, Jackson, and Thomas acquisitions, representing an observation period of 13 months. In performing its lifing analysis, petitioner did not examine a sample of the accounts, but instead examined all of the accounts throughout the entire observation period.

The initial step in petitioner's lifing analysis was to extract information from the masterfiles, organized by the month and year of the opening date of the account. The result of this step is a prooflisting showing, as of each monthend during the observation period, the number of accounts in each age group that were open at that date, and the balances of those accounts.[5] The next step was to compare consecutive monthend prooflistings to determine the number of accounts in each age group that closed in the intervening month. The final step was to combine the results of the monthly comparisons to produce runoff tables showing the probability that an account of a specified age would remain open for a specified period of time.[6] Petitioner

---

[5]Petitioner classified the accounts at each of the Acquired Banks by account type, i.e., DTA, regular savings, and TDOA. Petitioner then stratified by age the accounts in each category. This resulted in 363 categories.

[6]Petitioner originally treated each acquired account as a newly acquired account. Petitioner observed, however, that new accounts ran off faster than older accounts. Petitioner revised its deposit base valuation methodology in 1983 to stratify the runoff tables by age groups. The

produced separate runoff tables for the DTA, regular savings, and TDOA accounts of each of the Acquired Banks.

The next step in petitioner's deposit base valuation methodology was to use the runoff tables to project the net investable balances of the accounts. The balances of each age group of accounts at the valuation date were multiplied by the survival probabilities shown in the runoff table. Those balances were then reduced by float and reserve requirements to arrive at projected net investable balances. For DTA accounts, petitioner used the actual daily average balance during the month ended on the valuation date as the starting balance of the accounts for projecting future balances. For regular savings and TDOA accounts, which have low levels of activity, petitioner used the actual monthend balances. Petitioner did not increase projected balances to reflect expected growth in balances as a result of inflation.

Float is the portion of an account balance that is uncollected and therefore unavailable for investment. In order to arrive at the float assumption used in the deposit base valuation studies, petitioner studied the float experience of the Acquired Banks during 1981, as well as the float experience of other banking subsidiaries and survey data obtained from the Federal Reserve. Petitioner's deposit base valuation studies assumed a float rate of 5 percent for regular checking accounts. No float rate was applied to NOW accounts or other account types.

Reserve requirements refer to the portion of the account balance that is required to be maintained on deposit at the Federal Reserve Bank. Petitioner used the Reserve requirements established by the Federal Reserve Bank, which were 12 percent for DTA accounts and 3 percent for regular savings and TDOA accounts.

The next step in petitioner's deposit base valuation methodology was to multiply the net investable balances by a spread rate to arrive at the projected earnings from each of the age groups in each of the future years. The spread rate is a combination of two earnings rates and two cost rates. The earnings rates are the interest rate earned on

revision did not involve reliance on any data from periods after the effective dates of the acquisitions.

investable balances and the service charge income rate. The cost rates are the interest expense rate on the interest-bearing deposit accounts and the processing and overhead cost rate.

Petitioner arrived at the interest income rate based upon interest rates at which petitioner could invest in earning assets in the market at the time of the valuation studies, primarily the prime rate and the rates at which petitioner discounted the loans of the Acquired Banks. Petitioner used the following interest income rates:

| Acquired Bank | Interest income rate |
|---|---|
| Cobb Bank | 15.75 |
| Clayton Bank | 15.75 |
| Henry Bank | 15.75 |
| Houston Bank | 16.00 |
| Colquitt Bank | 14.75 |
| Dalton Bank | 14.75 |
| Hart Bank | 14.00 |
| Jackson Bank | 14.00 |
| Thomas Bank | 14.00 |

In order to arrive at the service charge income rate, reflecting charges for insufficient funds, returned checks, and balances below a stated minimum level, petitioner studied the experience of the Acquired Banks during 1981, as well as its experience, and survey data obtained from the Federal Reserve. Petitioner used a service charge income rate of 3 percent for regular checking accounts. A service charge income rate was not used for other account types.

In order to arrive at the interest expense rate, petitioner studied the actual and effective rates of interest at the Acquired Banks during 1981, as well as its rates of interest on similar accounts, and survey data obtained from the Federal Reserve. Petitioner used an interest expense rate of 5.25 percent for NOW accounts and regular savings accounts,[7] and a rate of 5 percent on TDOA accounts. In order to arrive at the processing and overhead cost rates, petitioner reviewed internal studies and cost accounting data, as well as survey data obtained from the Federal Reserve, on processing and overhead costs, giving greatest

---

[7] The maximum interest rate payable on regular savings accounts remained at 5.25 percent until January 1984, when it increased to 5.5 percent. 48 Fed. Reg. 50068 (Oct. 31, 1983).

weight to its internal information. Petitioner used a processing and overhead cost rate of 7 percent for demand deposit accounts, 2.5 percent for NOW accounts, 2 percent for regular savings accounts, and 1 percent for TDOA accounts. Petitioner computed a weighted average spread rate for DTA accounts based upon the separate spread rates for demand deposits and NOW accounts and weighted by the balances in those two account groups.

In the final step in petitioner's deposit base valuation methodology, petitioner discounted the projected earnings from each of the age groups in each of the future years to present value. Petitioner determined that the appropriate rate to use for discounting the projected earnings was the same as the interest income rate used in computing the spread, because it was the rate at the valuation date at which petitioner was willing to invest its fund in interest-bearing assets.

Petitioner submitted the deposit base valuation studies prepared for each of the Acquired Banks to the Office of the Comptroller of the Currency for its approval. The Office of the Comptroller of the Currency approved the recording on petitioner's books of deposit base in the amount determined by petitioner.

Under the amortization method adopted by petitioner for financial accounting and regulatory accounting purposes, the amortization deduction in each year is equal to the difference between the present value of all projected future income streams at the beginning of the year and the present value of all projected future income streams at the end of the year. The annual amortization amounts determined under this method are as follows:

| Year | Amount |
|------|--------|
| 1982 | $5,486,830 |
| 1983 | 7,010,848 |
| 1984 | 7,019,233 |
| 1985 | 5,619,216 |
| 1986 | 4,758,829 |
| 1987 | 4,306,836 |
| 1988 | 3,089,032 |
| 1989 | 2,570,389 |
| 1990 | 1,705,819 |
| 1991 | 151,984 |
| 1992 | 66,054 |
| Total | 41,785,070 |

Under the depreciation method adopted by petitioner for tax accounting purposes, the depreciation deduction in each year is equal to the present value at the acquisition dates of the projected income stream for the taxable year. The annual depreciation amounts determined under this method are as follows:

| Year | Amount |
|------|--------|
| 1982 | $9,250,982 |
| 1983 | 10,429,133 |
| 1984 | 7,279,214 |
| 1985 | 5,194,305 |
| 1986 | 3,822,420 |
| 1987 | 2,779,616 |
| 1988 | 1,526,107 |
| 1989 | 884,923 |
| 1990 | 546,728 |
| 1991 | 51,536 |
| 1992 | 20,106 |
| Total | 41,785,070 |

Petitioner conducted impairment studies as of June 1983, June 1984, and November 1985 in order to determine whether the value of the deposit base asset had become materially impaired. Such impairment studies were required by generally accepted accounting principles and by the Office of the Comptroller of the Currency. The bank accounting division of the Office of the Comptroller of the Currency establishes the accounting policies that banks follow and interprets generally accepted accounting principles as applicable to banks. To conduct the impairment studies, petitioner extracted information from the computerized masterfiles as of the date of the impairment studies in order to determine whether the balances of the accounts acquired from the Acquired Banks were materially less than the balances that the deposit base valuation studies had projected would exist at those dates. The impairment studies showed that there was no material impairment at any of the followup dates and that the balances were not materially less than the projected balances, but generally were greater than the projected balances. The impairment studies conducted by petitioner were not intended to portray precisely the number and the balances of the surviving acquired accounts but only to insure that there had not been a material impairment of the asset. The

following table compares the projected balances and the actual balances of the accounts (in thousands) at the dates of the impairment studies:

| Date | Projected balance | Actual balance |
|---|---|---|
| Acquisition | $187,507 | $187,507 |
| 06/83 | 143,813 | 161,748 |
| 06/84 | 119,397 | 150,727 |
| 11/85 | 93,631 | 129,708 |

The actual balances of the accounts of each Acquired Bank (in thousands) at the dates of the impairment studies were as follows:

| Acquired Bank | Actual balances at 6/83 | Actual balances at 6/84 | Actual balances at 11/85 |
|---|---|---|---|
| Cobb Bank | $48,478 | $45,327 | $36,088 |
| Clayton Bank | 24,400 | 22,852 | 18,179 |
| Henry Bank | 3,529 | 3,506 | 2,960 |
| Houston Bank | 16,513 | 17,443 | 14,678 |
| Colquitt Bank | 18,000 | 16,278 | 15,411 |
| Dalton Bank | 6,518 | 4,747 | 3,773 |
| Hart Bank | 15,325 | 13,721 | 14,318 |
| Jackson Bank | 8,970 | 8,316 | 7,923 |
| Thomas Bank | 20,015 | 18,537 | 16,378 |
| Total | 161,748 | 150,727 | 129,708 |

Petitioner also conducted a followup study to measure the actual loss of acquired deposit accounts. The study was conducted by Thomas Woods, a computer programmer and the special projects manager in the accounting systems department of petitioner. The study identified account closures of acquired accounts as of December 31, 1983, 1984, 1985, 1986, and June 30, 1987. The study was conducted separately for each account type. DTA accounts acquired from the Hart Bank were excluded from the study because the computer tape containing information on those accounts as of the monthend prior to the merger date could not be located and was presumed lost.

Woods wrote a computer program to identify which of the acquired accounts remained open by matching accounts based upon various criteria. Three criteria were used to identify open regular savings and TDOA accounts:

(1) Account number and account name.

(2) Account number, open date, account type, and customer type (to identify accounts where the name changed, i.e., was not identical character for character).

(3) Account name, open date, account type, and customer type (to identify accounts that had been renumbered).

The criteria Woods used to identify open DTA accounts differed from those used to identify open regular savings and TDOA accounts. When the DTA accounts of the Acquired Banks were placed in the files of petitioner after the acquisitions, some of the accounts of the Cobb, Clayton, and Henry banks had account numbers which were the same as the account numbers of existing accounts and consequently had to be renumbered. In the process of renumbering some of the other identifying information was also changed or updated. This made it necessary to utilize more extensive matching criteria and broader search pools to identify open DTA accounts. Account renumbering was not a problem for the other Acquired Banks or for regular savings and TDOA accounts at any of the Acquired Banks.

The first set of criteria for identifying open DTA accounts was applied to accounts open in what had been the Acquired Banks and consisted of:

(1) Account number, account name, and bank number (to identify accounts with no change in identifying information).

(2) Account number, open date, and bank number (to identify accounts where the name changed, i.e., was not identical character for character, but the account number and open date did not).

(3) Account name, open date, and bank number (to identify accounts that had been renumbered to avoid account number duplication with petitioner's existing accounts).

The vast majority of the open DTA accounts were identified using these three criteria.

The second set of criteria for identifying open DTA accounts was applied to a population of open accounts including all Atlanta branches of petitioner as well as all the Acquired Banks, in order to identify accounts that may have transferred from "bank" to "bank" in this group, and consisted of:

(1) Account number and account name (to identify accounts transferred with the same account number and name).

(2) Account number and taxpayer I.D. number (to identify accounts where the name changed, i.e., was not identical character for character, but the account number did not).

(3) Account name, taxpayer I.D. number, and open date (to identify accounts that may have been renumbered or transferred).

(4) Taxpayer I.D. number and open date (to identify accounts where the name and account number had both changed).

(5) Taxpayer I.D. number and an original open date prior to the previous follow-up or original study date and a new open date subsequent to that date (to identify accounts that may have been closed and then reopened).

The next step in the DTA followup study was a manual search of original accounts for accounts that were open at yearend 1983 in what had been the Acquired Banks and that had open dates prior to the original study date but which had not yet been matched. These accounts were either acquired accounts where so much of the identifying information had changed that the computer was unable to detect a match, or accounts that had transferred into the Acquired Banks from other parts of petitioner's system. The number of accounts for which the manual search was conducted was less than 2 percent of the original number of acquired accounts. Ten accounts were found in the manual search. An example of one of the 10 accounts found in the manual search was an account to which, in the course of renumbering, apparent typographical errors had been made in entering both the social security number and the opening date.

Finally, the search pool for open DTA accounts was expanded to include all of petitioner's branches in Georgia in order to find acquired accounts that might have transferred out of Atlanta and out of the Acquired Banks into other banks in Georgia. In this search, the criteria were taxpayer I.D. number, an original open date prior to the previous study date, and a new open date subsequent to that date. This level of the study identified about 1 percent of the total number of open DTA accounts in any period. Accounts that were identified in this level are referred to as "false closures." A great many of the DTA accounts identified as "false closures" actually closed at a later time during the period covered by the followup study. These closures were measured and recorded. An account that

closed and then reopened sometime in the future, although not simultaneously, was considered an open account if it reopened in the same period from followup date to followup date.

The followup study shows that the following percentages of DTA, regular savings, and TDOA accounts acquired from all of the Acquired Banks (other than the acquired DTA accounts of the Hart Bank) were open at the following dates:

| Date | Percentage |
|---|---|
| 12/31/83 | 67.1 |
| 12/31/84 | 52.0 |
| 12/31/85 | 41.9 |
| 12/31/86 | 35.2 |
| 06/30/87 | 31.4 |

Petitioner had projected that the following percentages of the DTA, regular savings, and TDOA accounts acquired from all of the Acquired Banks (other than the acquired DTA accounts of the Hart Bank) would remain open at the following dates:

| Date | Percentage |
|---|---|
| 12/31/83 | 67.3 |
| 12/31/84 | 56.1 |
| 12/31/85 | 47.3 |
| 12/31/86 | 39.2 |
| 06/30/87 | 32.7 |

The ratio of NOW account balances to total DTA account balances at the Acquired Banks other than Cobb, Clayton, and Henry, at the original valuation date and by yearend average balances for the taxable years 1983 through 1986 was as follows:

| Year | Percentage |
|---|---|
| Valuation | 25.4 |
| 1983 | 24.8 |
| 1984 | 26.9 |
| 1985 | 28.2 |
| 1986 | 29.6 |

Petitioner deducted $9,250,982 for the depreciation of the deposit base on its Federal income tax return for the taxable year 1982. In the statutory notice of deficiency, the Commissioner disallowed the deduction because he determined that the underlying expenditure was for the purchase

of goodwill and going-concern value which are nondivisible assets with indeterminable lives and, therefore, could not be amortized.

OPINION

Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business. The term "property" includes intangibles, and the rules for the allowance of the depreciation deduction for intangibles are set forth in section 1.167(a)-3, Income Tax Regs., as follows:

> Sec. 1.167(a)-3. Intangibles.
>
> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

To qualify under the foregoing regulation for a depreciation deduction with respect to the deposit base, petitioner must show that the deposit base (1) had an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the Acquired Banks, and (2) had a limited useful life, the duration of which could be ascertained with reasonable accuracy. Whether these requirements have been satisfied is essentially a factual question. *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1245-1251 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); *Banc One Corp. v. Commissioner*, 84 T.C. 476, 492 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987);[8] *L.A. Central Animal Hospital v. Commissioner*, 68 T.C. 269, 273

---

[8]In *Banc One Corp. v. Commissioner*, 84 T.C. 476, 498 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987), we held that the taxpayer was not entitled to depreciation deductions with respect to the core deposit intangible because the taxpayer did not establish a proper method for depreciation. The only evidence submitted by the taxpayer to calculate depreciation relied upon events occurring after the taxable years in issue. Consequently, we did not address the issue of whether the core deposit intangible was a depreciable asset. See also *Southern Bancorporation, Inc. v. Commissioner*, 847 F.2d 131(4th Cir. 1988), affg. a Memorandum Opinion of this Court.

(1977). Petitioner bears the burden of proof. *Welch v. Helvering,* 290 U.S. 111 (1933); *Houston Chronicle Publishing Co. v. United States, supra* at 1245.

At the outset, it is crucial to focus on exactly what petitioner valued and depreciated. Petitioner examined only the income that it expected to derive from the use of the balances of the core deposit accounts existing at the acquisition dates. Although petitioner certainly hoped that during the period between the acquisition of a bank and the closure of an account the average balance in the account might increase, petitioner did not take this into account. Petitioner also did not include any income that would be derived from future accounts. The life and value of deposit base was based solely upon the core deposits acquired in the purchase.

Petitioner initially contends that deposit base must be depreciated because depreciation clearly reflects income and the clear reflection of income is the governing principle of tax accounting. Sec. 446. Petitioner argues that goodwill is not defined in the regulation and that respondent cannot "label" a particular asset "goodwill" and thereby deny depreciation of it. Petitioner, in effect, argues that because the regulation does not explicitly define deposit base as goodwill, deposit base is not goodwill. Respondent, however, is more than just "labeling" deposit base "goodwill." Respondent contends that what petitioner "labels" deposit base is nothing more than "goodwill" as that term has been interpreted by the courts. Petitioner's position fails to consider the case law interpreting goodwill within the meaning of the regulation. As a threshold matter, petitioner must establish that deposit base is an asset separate and distinct from goodwill as that term is interpreted in the case law.

The nature of goodwill is the expectancy that "old customers will resort to the old place." *Commissioner v. Killian,* 314 F.2d 852, 855 (5th Cir. 1963); *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 232 (1975). The essence of goodwill is the expectancy of continued patronage, for whatever reason. *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 681 (5th Cir. 1971), quoting

*Boe v. Commissioner,* 307 F.2d 339, 343 (9th Cir. 1962).[9]

The parties have drawn our attention to the recent opinion in *AmSouth Bancorporation & Subsidiaries v. United States,* 681 F. Supp. 698 (N.D. Ala. 1988), on appeal (11th Cir., May 6, 1988). In that case, the court concluded that the taxpayer had not met its burden of proving that deposit base had a value separate and distinct from the goodwill of the acquired bank. In reaching its conclusion, the court relied upon the fact that deposit relationships are a point of contact with customers for selling income-producing services of the bank. The court concluded that this tends to make the deposit relationship inseparable from goodwill when it exists. *AmSouth Bancorporation & Subsidiaries v. United States, supra* at 719-720. The court also relied upon the fact that the value of deposit base results from the expectation that the depositors will allow their deposits to remain at the bank and earnings will result therefrom. The court concluded that this expectation is akin, if not tantamount, to the expectancy that "old customers will resort to the old place" of business. *AmSouth Bancorporation & Subsidiaries v. United States, supra* at 720. The record in the case before us is different from the record in the District Court. Our examination of the testimony and exhibits, including the testimony of the expert witnesses and their reports compels a result different from the result reached by the District Court.

Respondent argues that deposit base is a component of each Acquired Bank's customer relationship, which is in itself a component of goodwill. Respondent's expert, Dr. Donald Puglisi, states in his expert report that core deposits are an integral component of the bank's overall customer relationship and that they are vehicles for the selling of the bank's other income producing services. He states that the value of the core deposit intangible is inextricably related to the value of the overall customer relationship. Puglisi is a professor of finance at the Univer-

---

[9]Going-concern value as distinguished from goodwill is the additional element of value which attaches to property by reason of its existence as an integral part of a going concern. *VGS Corp. v. Commissioner,* 68 T.C. 563, 591 (1977). Going-concern value is "bottomed on the ability of the acquired business to generate sales without any interruption because of the take over." *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 685 n. 12 (5th Cir. 1971). Going-concern value is also nondepreciable. *VGS Corp. v. Commissioner, supra* at 592.

sity of Delaware and has a doctor's degree in business administration from Indiana University. Respondent argues that petitioner's strategy is to "carve out" deposit base from the goodwill of the Acquired Banks in an attempt to depreciate it. Respondent asserts that the courts have almost uniformly rejected this fragmentation approach with respect to intangible assets that, because of their indefinite useful life and self-regenerating ability, are inextricably linked to goodwill. *Marsh & McLennan, Inc. v. Commissioner*, 420 F.2d 667 (3d Cir. 1969); *Boe v. Commissioner, supra; Thrifticheck Service Corp. v. Commissioner*, 287 F.2d 1 (2d Cir. 1961); *Golden State Towel & Linen Service, Ltd. v. United States*, 179 Ct. Cl. 300 (1967). Based upon the authorities which respondent cites, it appears that he is urging us to apply the "mass asset" rule although he does not articulate his position as such.

With respect to the "mass asset" rule, the Court of Appeals for the Fifth Circuit[10] has held:

> The "mass asset" rule has been applied where arguably distinct assets are "inextricably" linked to goodwill, *see Golden State Towel & Linen Service, Ltd. v. United States, supra*, and where the seemingly separate assets possess the same qualities as goodwill, possessing no determinable useful life and having self-regenerating capability, *see Winn-Dixie Montgomery, Inc. v. United States, supra.* * * *
>
> Most of the cases purporting to apply the "mass asset" rule involve evidentiary failures on the part of the taxpayer. * * * Without compiling the myriad cases that discuss the "mass asset" rule, we are satisfied that the rule does not establish a *per se* rule of non-amortizability in every case involving both goodwill and other intangible assets. In the light of sec. 167(a) of the Code and Regulation sec. 1.167(a)-3, we are convinced that the "mass asset" rule does not prevent taking an amortization deduction if the taxpayer properly carries his dual burden of proving that the intangible asset involved (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy.
>
> Where the taxpayer has been able to satisfy this perhaps extremely difficult burden, depreciation expense deductions have been allowed.
>
> [*Houston Chronicle Publishing Co. v. United States, supra* at 1249-1250. Fn. refs. omitted.]

---

[10]The Court of Appeals for the 11th Circuit (the court to which this decision is appealable) will follow the precedent of the Court of Appeals for the Fifth Circuit as it existed on Sept. 30, 1981. *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir. 1981).

Respondent next contends that petitioner is claiming a deduction for the cost of "purchased, terminable-at-will" customer relationships and that any value attributable to these relationships is a component of goodwill because petitioner has no right to the funds but merely expects that because there is a pre-existing business relationship the customers will remain with the bank. Respondent's position is essentially based upon the assumption that terminable-at-will relationships represent goodwill. Respondent relies upon *Sunset Fuel Co. v. United States,* 519 F.2d 781 (9th Cir. 1975); *Skilken v. Commissioner,* 420 F.2d 266 (6th Cir. 1969), affg. 50 T.C. 902 (1968); *Boe v. Commissioner, supra; Thrifticheck Service Corp. v. Commissioner, supra; United States Industrial Alcohol Co. v. Helvering,* 137 F.2d 511 (2d Cir. 1943), affg. on this issue 42 B.T.A. 1323 (1940); *Imperial News Co. v. United States,* 576 F. Supp. 865 (E.D. N.Y. 1983), affd. without published opinion 742 F.2d 1434 (2d Cir. 1984); *General Television, Inc. v. United States,* 449 F. Supp. 609 (D. Minn. 1978), affd. per curiam 598 F.2d 1148 (8th Cir. 1979); *Golden State Towel & Linen Service, Ltd. v. United States, supra.* After reviewing these cases, we do not interpret them as holding that terminable-at-will relationships are as a matter of law the equivalent of goodwill and, therefore, not depreciable.

In *Sunset Fuel Co. v. United States, supra,* the taxpayer purchased a customer list and, as customers discontinued doing business with the taxpayer, it sought to deduct under section 165 a portion of the cost of the list. The court held that the formula used to assign a value to each customer lost was arbitrary and failed to realistically value the individual accounts lost. *Sunset Fuel Co. v. United States, supra* at 785.

In *Skilken v. Commissioner, supra,* the taxpayer purchased vending machines at various locations. The excess of the purchase price over the fair market value of the tangible property acquired was capitalized as location costs. The agreements with the owners of the various locations for use of the locations were oral and terminable at will. As the various agreements were terminated, the taxpayer sought to deduct under section 165 a portion of the location costs. The court held that the locations purchased represented

goodwill. *Skilken v. Commissioner, supra* at 270. The court relied upon the fact that the taxpayer did not separately value the locations and that the rule of thumb valuation employed by petitioner was not an accurate reflection of the value of any particular location. *Skilken v. Commissioner, supra* at 270. The court in *Houston Chronicle Publishing Co. v. Commissioner, supra* at 1250, stated that the taxpayer in *Skilken* failed to establish an ascertainable useful life.

In *Boe v. Commissioner, supra,* the taxpayer and his three partners purchased a medical services business, the principal asset of which was 8,984 terminable-at-will medical service contracts. The taxpayer did not separately value the individual contracts. The taxpayer allocated a cost of $30.94 to each contract and attempted to deduct as a loss, each contract as it was terminated. The court stated that it doubted that any value could be assigned to the contracts apart from goodwill and held that, even if a part of the purchase price could be assigned to the contracts, the contracts were purchased as a single, indivisible asset and could not be amortized or individually subject to loss deductions. *Boe v. Commissioner, supra* at 343. The Ninth Circuit subsequently held that the inability to establish a cost basis for particular accounts does not necessarily prevent a taxpayer from charging off a truly wasting asset against the income it currently generates, because the taxpayer can show that the mass as a whole has a limited useful life and can depreciate it. *Sunset Fuel Co. v. United States, supra* at 784 n. 4.

With respect to *Thrifticheck Service Corp. v. Commissioner, supra,* the court in *Houston Chronicle Publishing Co. v. Commissioner, supra* at 1249, stated that in that case the amount paid for customer contracts was not entitled to be deducted as a depreciable expense and was instead lumped together into one nondepreciable asset that included the expectation of future business and that the holding rested squarely upon the failure of the taxpayer to prove a reasonable period over which the amounts should have been amortized.

In *United States Industrial Alcohol Co. v. Helvering, supra,* the taxpayer purchased all the assets of a distilling

company and assumed its liabilities. Among the assets purchased were 214 contracts for the delivery of industrial alcohol before the end of the year. The primary purpose for the acquisition of the contracts was not to make a profit on sales related to the contracts but to insure a market for future sales. The court held that the advantage acquired was not an exhaustible asset. *United States Industrial Alcohol Co. v. Helvering, supra* at 514.

In *Imperial News Co. v. United States, supra,* the taxpayer, a magazine distributor, purchased several companies and the purchase agreements allocated a substantial amount of the purchase price to "goodwill" or to "distribution contracts and goodwill." However, the taxpayer did not acquire any distribution contracts because no such contracts existed. The taxpayer attempted to depreciate an intangible asset which it characterized as a "right to distribute." Any relationship which existed between the taxpayer or its predecessors and national distributors was terminable at will. The court held that what the taxpayer acquired was simply the expectation that publishers and national distributors would continue to do business with it in its new geographical areas, i.e., the probability of continued patronage. *Imperial News Co. v. United States, supra* at 867. The taxpayer made no claim that any publisher or distributor had ceased to deal with it after the acquisitions.

In *General Television, Inc. v. United States, supra,* the taxpayer purchased cable television systems and claimed depreciation on the subscribers' contracts. The contracts were terminable at will. The court held that all that the subscribers' contracts represented was the expectancy of continued patronage, which is the essence of goodwill. *General Television, Inc. v. United States, supra* at 611-612. The Eighth Circuit affirmed per curiam on the basis of the District Court's opinion. In *Donrey, Inc. v. United States,* 809 F.2d 534 (8th Cir. 1987), the Eighth Circuit rejected the Government's argument that *General Television* established that terminable-at-will subscription lists are nondepreciable as a matter of law. The court held that entitlement to a depreciation allowance for an intangible asset is a question of fact. *Donrey, Inc. v. United States, supra* at 536.

In *Golden State Towel & Linen Service, Ltd. v. United States, supra,* the taxpayer purchased two linen service corporations and in the purchase agreements allocated amounts to customer lists. The taxpayer sought to deduct as a loss under section 165 the cost of acquisition of a purchased customer in the year in which that customer ceased doing business with the taxpayer. The court disallowed the deduction on the basis that the customer list was an indivisible asset and that a tax loss may be claimed only when all or a substantial and identifiable portion of the list is terminated permanently and then only where the loss may be adequately measured. *Golden State Towel & Linen Service, Ltd. v. United States, supra* at 944.

The fact that a deposit account has no fixed termination date and is terminable at will does not as a matter of law prevent petitioner from factually showing that deposit base has an ascertainable cost basis separate and distinct from goodwill and that it has a reasonably ascertainable useful life. See *Donrey, Inc. v. United States, supra; Super Food Services, Inc. v. United States,* 416 F.2d 1236 (7th Cir. 1969); *First Pennsylvania Banking & Trust Co. v. Commissioner,* 56 T.C. 677 (1971).[11] We emphasize the factual nature of our inquiry.

In *Donrey, Inc. v. United States, supra,* the taxpayer purchased a newspaper company and claimed depreciation deductions with respect to the portion of the purchase price which it allocated to the paper's subscription structure. The subscriptions were terminable at will. In the District Court, a jury found that the list had an ascertainable value separate and distinct from goodwill and that the list had a limited useful life, the duration of which could be ascertained with reasonable accuracy. The Government filed a motion for judgment notwithstanding the verdict. In denying the Government's motion, the District Court determined that reasonable minds could differ as to the correct result and that there was evidence from which the jury could properly find for the taxpayer. On appeal, the Government argued that the subscription structure was part of the goodwill purchased and was not depreciable as a matter of law. The court held, however, that entitlement to a deprecia-

---

[11]See also *Business Services Industries, Inc. v. Commissioner,* T.C. Memo. 1986-86.

tion allowance for an intangible asset is a question of fact. *Donrey, Inc. v. United States, supra* at 536. The court then went on to conclude that the District Court applied the correct test in considering whether to overturn the jury's verdict and that, based upon the evidence, it reached the correct conclusion. *Donrey, Inc. v. United States, supra* at 537.

Respondent contends that the outcome of *Donrey, Inc. v. United States, supra,* is erroneous and, alternatively, that even if it were correctly decided, it is distinguishable from the instant case. Respondent contends that because the subscription list was used to generate advertising revenue, which accounted for 80 percent of the newspaper's gross revenue, the court viewed the subscription list as representing information rather than the firm's customer base. The opinion of the court does not support respondent's contention. In fact, the court four times referred to the asset in question as the newspaper's "subscription structure." *Donrey, Inc. v. United States, supra* at 535. Respondent also argues that the case is distinguishable because when the subscribers terminated their subscriptions, they terminated their total relationship with the firm, whereas petitioner did not demonstrate that when particular deposit accounts closed that the customer relationship terminated. Even if this were the case,[12] the fact remains that once the customer closes his account, the bank no longer has that money to invest. Petitioner's expert, Dr. George Benston, states in his expert report that the existence of other benefits besides deposited funds from deposit customers does not obscure or complicate the valuation of deposit base. Benston is the John H. Harland Professor of Finance, Accounting, and Economics at Emory University. Benston is a Certified Public Accountant, has a M.B.A. degree in accounting and taxation from New York University, and a Ph.D. degree in Economics from the University of Chicago.

In *Super Food Services, Inc. v. United States, supra,* the taxpayer acquired retail franchise contracts which it sought to depreciate. All of the contracts were terminable by either

---

[12]See *Midlantic National Bank/Merchants v. Commissioner,* T.C. Memo. 1983-581, wherein we stated that deposit relationships when severed tend to result in the termination of all other bank-customer relationships.

party upon 30 days' notice. The Government argued that because the contracts were terminable at will on 30 days' notice, no estimate of their period of utility to the taxpayer's business was possible. The court, in reversing the lower court's entry of summary judgment, rejected this argument and held that:

neither the statute nor the regulations establish such an inflexible standard. The appropriate test is whether the particular taxpayer has adequately demonstrated that in his business the useful life of the challenged intangibles may be reasonably approximated. *Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 654-655, 51 S.Ct. 262, 75 L.Ed. 594. It is immaterial that the contracts may have no fixed termination date. Cf. *Manhattan Co. of Virginia, Inc.,* 50 T.C. 78, 96, appeal dismissed (4th Cir. 1968); *Vaaler Insurance, Inc. v. United States,* 68-1 U.S.T.C. par. 9183 (D.N.D. 1968); *Johnson v. United States,* 61-1 U.S.T.C. par. 9278 (W.D. Tex. 1961). [*Super Food Services, Inc. v. United States, supra* at 1240.]

Respondent attempts to distinguish *Super Food Services, Inc. v. United States, supra,* on the basis that the taxpayer, unlike petitioner in the instant case, valued the contracts individually at the time of purchase. The court discussed individual valuation as a reason for not applying the "mass asset" doctrine. *Super Food Services, Inc. v. United States, supra* at 1239. The court did not advance this as a reason for rejecting the Government's terminable-at-will argument. The court rejected the Government's terminable-at-will argument because "neither the statute nor the regulations establish such an inflexible standard." *Super Food Services, Inc. v. United States, supra* at 1240.

In *First Pennsylvania Banking & Trust Co. v. Commissioner, supra,* the taxpayer acquired a loan servicing business as a going concern. The taxpayer entered into written agreements with the lenders which provided for the assignment of the seller's right to service existing mortgages. The taxpayer also entered into written agreements to service future mortgages. All of the agreements with the lenders provided for cancellation, without penalty or premium, by the lending institution on written notice. Pursuant to the acquisition the taxpayer acquired (1) a loan servicing business as a going concern, (2) that business' right to service existing loans of various lending institutions, (3) an opportunity to service future loans of those institutions, (4)

the right to utilize escrow funds associated with the existing loans, and (5) an opportunity to utilize funds associated with future loans. The escrow funds consisted of payments made monthly in advance to furnish sufficient funds for the taxpayer to pay insurance premiums and real estate taxes on the property. These escrows could be deposited in the taxpayer's banking department where it would be able to utilize the funds interest-free in its own lending operations and hence derive profit therefrom. The Government conceded that the right to service existing loans was amortizable and we held that the opportunity to utilize the escrow funds associated therewith was amortizable. *First Pennsylvania Banking & Trust Co. v. Commissioner, supra* at 691. We rejected the argument that no part of the purchase price could be allocated to the right to service existing loans under at will contracts, holding that:

As a practical matter * * * petitioner's contract rights to service existing loans were not likely to be terminated. They have a definite life expectancy and may be valued. [*First Pennsylvania Banking & Trust Co. v. Commissioner, supra* at 698 n. 12.]

Respondent contends that *First Pennsylvania Banking & Trust Co. v. Commissioner, supra,* is distinguishable because the taxpayer was assured the use of a fixed amount of funds over a fixed period of time pursuant to a formal written contract which it acquired. Respondent's contention, however, is simply not supported by the facts. The taxpayer was not assured the use of a fixed amount of funds for a fixed period of time. The lenders could terminate the service agreements by simply giving written notice.

The value of the escrow funds, like the value of the core deposits, is due to their being a low-cost source of funds. The escrow funds were available to First Pennsylvania as long as it retained the servicing of the loans with which they were associated, but the loan servicing could be withdrawn at any time by the lenders. The lives of the escrows, therefore, depended upon the lenders not withdrawing their business, just as the life of deposit base depends upon depositors not closing their accounts. The escrows were purchased in a transaction in which First Pennsylvania acquired a going concern which expected to obtain new servicing and new escrows in the future. Similarly, the

deposit base was acquired in the purchase of going concerns which expected to obtain new deposit accounts in the future. Our holding that the opportunity to use the existing escrow funds was an amortizable intangible asset supports petitioner's position that deposit base is an asset separate and distinct from goodwill.

Respondent next contends that because core deposits are liabilities, petitioner's attempt to recharacterize them as an asset is inaccurate and misleading. Petitioner contends that although core deposits are a liability, deposit base is an asset. Certainly, petitioner will have to pay the depositors as they withdraw their funds. However, until such time, petitioner will be able to invest the funds. Petitioner ascertained that the deposit accounts closed at predictable rates and quantified the benefit which it would receive from the use of the funds. It is this benefit which petitioner set up as an asset and depreciated. John Harrison of First Boston Corp., petitioner's investment banker, testified that although deposits appear on the liability side of the balance sheet, they create value to the extent that their cost may be more attractive than higher-cost deposits.

Respondent next contends that petitioner's treatment of deposit base is inconsistent with the Acquired Bank's treatment of the expenses incurred to attract deposit customers. The Acquired Banks expended and deducted amounts under section 162 for advertising, marketing, business development, promotion, salaries, and other expenses connected with attracting and retaining customers in the taxable years prior to their acquisition. Respondent argues that it is a well-established rule of tax law that currently deducting such expenditures is appropriate only where the expenditures do not create or enhance a separate and distinct asset that has a life extending beyond the taxable year. *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. 345 (1971). Expenditures which create such separate and distinct assets must be capitalized and may not be deducted in computing taxable income. *NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir. 1982); *Colorado Springs National Bank v. United States,* 505 F.2d 1185 (10th Cir. 1974); *Briarcliff Candy Corp. v. Commissioner,* 475 F.2d 775 (2d Cir. 1973), revg. a Memorandum

Opinion of this Court. Relying on these cases, respondent concludes that because the Acquired Banks did not capitalize these expenditures, they did not view them as creating an asset separate and distinct from goodwill for tax purposes and that it is inconsistent for petitioner to now seek to establish as an asset and depreciate the amount it paid for the value added to the Acquired Banks by these expenditures.

The above cases upon which respondent relies, however, are distinguishable in that they do not involve purchased assets. Rather, the cases address the issue of whether particular expenditures should be currently expensed or capitalized. In *Commissioner v. Lincoln Savings & Loan Association, supra,* the Supreme Court held that payment by a State-chartered savings and loan association of the "additional premium" required by the National Housing Act to be paid to the Federal Savings & Loan Insurance Corp. was not a deductible expense under section 162. In *NCNB Corp. v. United States, supra,* the court held that a national bank's expenditures for various market and feasibility studies and applications to the Comptroller of the Currency, in connection with its establishment of a State-wide network of branch banks, were current expenses deductible under section 162.[13] In *Colorado Springs National Bank v. United States, supra,* the court held that computer costs, credit checks, and promotional activities, all of which were startup expenses of the bank's credit card system were deductible under section 162. In *Briarcliff Candy Corp. v. Commissioner, supra,* the court held that the costs of developing a network of franchised dealers were deductible under section 162. We reject respondent's attempt to base the recognition of a purchased intangible asset upon whether the seller deducted or capitalized the expenses which created it.[14]

---

[13]In *Central Texas Savings & Loan Association v. United States,* 731 F.2d 1181 (5th Cir. 1984), the court held that these expenditures were capital costs.

[14]If we were to accept respondent's theory, we are curious how respondent would treat goodwill. Respondent offers no explanation as to why goodwill would be treated differently from any other purchased intangible asset. An entity does not carry internally created goodwill as an asset on its books. Under respondent's theory, it would seem that purchased goodwill would not be carried as an asset on the purchaser's books. If this were the case, the issue as to whether an asset is separate and distinct from goodwill would not arise.

Respondent next contends that deposit base cannot be transferred apart from a transfer of the goodwill of a bank. Petitioner counters that "pure" deposit assumption transactions, i.e., assumption of deposit liabilities without acquisition of assets other than the deposited funds, frequently occur with respect to failing banks. Bennett Brown, chief executive officer of petitioner, testified that petitioner had bid for such deposits, although unsuccessfully. Petitioner contends that *Midlantic National Bank/Merchants v. Commissioner*, T.C. Memo. 1983-581, involved such a sale and we held that the requirements for depreciation were met. In *Midlantic National Bank/Merchants v. Commissioner, supra,* however, the taxpayer did not acquire the deposits of the failed bank but acquired a solicitation right which gave it the opportunity to solicit deposits from the failed bank's former depositors. We found the solicitation right to be the equivalent of a customer list. Thus, *Midlantic National Bank/Merchants v. Commissioner, supra,* does not support petitioner's contention.

Petitioner argues in the alternative that separate sales are not required to establish that an asset has a determinable value separate from goodwill. *Laird v. United States,* 556 F.2d 1224 (5th Cir. 1977); See *KFOX, Inc. v. United States,* 206 Ct. Cl. 143 (1975). In a case involving the purchase of a professional football team, the Fifth Circuit in *Laird v. United States, supra,* held:

the [players'] contracts had an ascertainable value separate and distinct from the value of the franchise (which thus has the same significance in this case as goodwill had in *Houston Chronicle*) * * * the valuation figure set by the district judge for the players' contracts was supported by the evidence, and reflected their own particular value, notwithstanding the fact that they were acquired in a bundle of rights and intangibles. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

It does not matter for purposes of amortization if individual assets only have economic significance in the context of an integrated transaction involving the sale of a number of assets.
[556 F.2d at 1233-1234. Fn. refs. omitted.]

Applying this analysis to deposit base, it is irrelevant for purposes of depreciation that deposit base cannot be separately transferred and only has economic significance in

the context of a bank. Accordingly, the separate transferability of deposit base is not required in order to establish that deposit base has a determinable value separate and distinct from goodwill.

Respondent next contends that petitioner's allocation of the purchase price to deposit base and goodwill is contradicted by the evidence of the magnitude of goodwill possessed by the Acquired Banks and is patently incorrect. Respondent argues that the Acquired Banks possessed favorable location, excess earnings capacity, good local reputation, customer relationships with non-core depositors and loan customers, experienced management and workforce, and other going-concern values. Respondent's argument, however, is properly directed to the allocation to be made between deposit base and goodwill. It should not be relied upon to establish that deposit base is not separate and distinct from goodwill.

Respondent next contends that tax benefits motivated petitioner to allocate as much of the purchase price as possible to deposit base. Respondent characterizes the deposit base calculations of petitioner as nothing more than "self-serving accounting shenanigans." We have no doubt that petitioner allocated as much of the purchase price as possible to the deposit base in order to take advantage of the tax benefits. However, it is not improper for petitioner to attempt to minimize its tax liability. Respondent's argument misses the mark.

Respondent next contends that the deposit base computation actually measures the value of Federal deposit insurance to petitioner. Respondent reasons that deposit insurance permits petitioner to attract deposit funds at a lower cost than it would incur to obtain uninsured funds and, therefore, deposit insurance increases the spread between petitioner's cost of funds and its income from assets acquired with those funds. Because deposit base is defined as the present value of the spread, respondent contends that the benefit of deposit base flows in part from the difference between the cost to petitioner of insured and uninsured funds. Because the life of the Federal deposit insurance guarantee is indefinite in that it will exist as long as the business of the bank continues, respondent concludes

that the value of deposit base is attributable to an element of the bank's going-concern value with an indefinite life.

Respondent's expert, Dr. Edward Kane,[15] occupies the Everett D. Reese Chair of Banking and Monetary Economics at Ohio State University. He has a Ph.D. degree in economics from Massachusetts Institute of Technology. In his expert report he states that "most of the value attributed by the accounting methods used to measure intangible core deposits in this case capture *de facto* the economic value of federal credit enhancements on the designated categories of deposits." Kane, however, testified that his conclusion assumed a perfect market. He described a perfect market as one in which everyone has full information and there are no transaction costs. In a perfect market a .01 percent difference in interest rates would cause the deposits to move. Kane testified that core deposits would not exist in a perfect market. We dismiss Kane's theory as not applicable to the facts of the instant case.

Respondent's witness, Charles Wells, retired president of the Clayton Bank, testified that deposit insurance is not a competitive tool because all banks have it. Federal deposit insurance, therefore, offered no premium value to a purchaser of the Acquired Banks. See *VGS Corp. v. Commissioner*, 68 T.C. 563, 590-591 (1977) (foreign oil import quota created no goodwill capable of being transferred as it gave no competitive advantage).

Respondent next contends that petitioner viewed the deposit relationships as goodwill in valuing the Acquired Banks. Respondent argues that petitioner focused on the anticipated growth of deposits rather than the number of existing accounts or the level of existing deposits. Respondent argues that no attempts were made to separately project the earnings of existing deposits and new deposits, nor did petitioner segregate the earnings on core deposits from the earnings of the bank as a whole. Respondent concludes that petitioner's failure to value deposit base separately in the acquisition process casts considerable

---

[15]Respondent's experts, Kane and Puglisi, also appeared as expert witnesses on behalf of the Government in *AmSouth Bancorporation & Subsidiaries v. United States*, 681 F. Supp. 698 (N.D. Ala. 1988). Summaries of their expert reports and opinions are attached as an addendum to the opinion in that case.

doubt on its later attempt to value it and depreciate it for tax purposes.

We must consider, however, the realities of business life:

although tax reporting often compels an apportionment of the aggregate purchase price among the individual assets, the purchaser of an operating business is buying a unitary economic enterprise, not a basket of discrete assets. The information yielded by an item-by-item appraisal may thus be of little use to a purchaser, like petitioner, who bases his investment decisions upon earnings or return on investment rather than underlying asset values. The seller may be indifferent to individual asset allocations even for tax purposes where, as in the current case, a complete liquidation is to follow the sale. (See sec. 337.) [*Banc One Corp. v. Commissioner*, 84 T.C. at 495.]

Certainly, a specific allocation in the purchase agreement or in negotiations leading thereto may be the best evidence of petitioner's basis in each asset. Where such evidence is not present, however, we must allocate the aggregate purchase price among the individual assets based upon the evidence available to us. *Banc One Corp. v. Commissioner*, *supra* at 495. In the instant case, the evidence establishes that core deposits were of paramount concern and that petitioner was keenly aware of their value in determining the purchase prices.

Petitioner argues that the acquisition of core deposits was the primary purpose for the purchase of the Acquired Banks. Bennett Brown, chief executive officer of petitioner, testified that core deposits were the principal reason petitioner decided to purchase the Acquired Banks. John Poelker, petitioner's chief negotiator, testified that the underlying strategy of the acquisition process was to improve petitioner's level of core deposits and that the Acquired Banks had very high levels of core deposits.

Petitioner also contends that the level of core deposits at each Acquired Bank was one of the factors that determined the purchase price. Brown and Poelker testified that the level of core deposits at the Acquired Banks was a factor in deciding how much to pay for each bank. John Harrison of First Boston Corp., petitioner's investment banker, testified that First Boston Corp. would have recommended a lower purchase price if the level of core deposits in the Acquired Banks had been materially lower.

The computerized acquisition model used by petitioner to establish offering prices for the Acquired Banks valued the income stream generated by predicted deposit levels including the initial level of deposits as well as future growth in deposits, but did not separately compute a value for deposit base or any of the assets shown on the balance sheets of the banks. In a sensitivity analysis of the acquisition model for the Cobb Bank, petitioner replaced the acquired core deposits that were projected to survive in each future year with more expensive money market liabilities. This reduced the model's recommended purchase price from $21.1 million to $5.6 million, a reduction of $15.5 million. Petitioner contends that the $15.5 million is the portion of the purchase price projected by the acquisition model which is attributable to the acquired deposit base.

Petitioner next contends that under generally accepted accounting principles, deposit base is recognized as being separate from goodwill. Accounting Principles Board (APB) Opinion No. 17, "Intangible Assets" (August 1970), provides that intangible assets acquired as part of an acquired enterprise should be recorded at cost at the date of acquisition. The cost of identifiable intangible assets is an assigned part of the total cost of the enterprise acquired, normally based upon the fair values of the individual assets.[16] Such cost must be amortized by systematic charges to income over the periods estimated to be benefited. Financial Accounting Standards Board (FASB) Interpretation No. 9, "Applying APB Opinions No. 16 and 17 When a Savings and Loan Association or Similar Institution is Acquired in a Business Combination Accounted for by the Purchase Method" (February 1976), specifically lists the capacity of existing savings accounts to generate future income as an identifiable intangible asset. FASB Statement No. 72, "Accounting for Certain Acquisitions of Banking or Thrift Institutions" (February 1983), provides as follows:

> In a business combination accounted for by the purchase method involving the acquisition of a banking or thrift institution, intangible assets acquired that can be separately identified shall be assigned a portion of the total cost of the acquired enterprise if the fair values of those assets can be reliably determined. The fair values of such assets

---

[16]See also APB Opinion No. 16, "Business Combinations" (August 1970).

that relate to depositor or borrower relationships shall be based on the estimated benefits attributable to the relationships that *exist* at the date of acquisition without regard to new depositors or borrowers that may replace them. Those identified intangible assets shall be amortized over the estimated lives of those existing relationships. [FASB Statement 72 par. 4. Emphasis in original. Fn. refs. omitted.]

Petitioner next contends that the regulatory authorities recognize deposit base as being separate from goodwill. In December 1981, the Office of the Comptroller of the Currency (OCC) issued Banking Circular 164 which allowed banks to record deposit base as an identified intangible asset and amortize it over the life of the acquired deposit accounts, but not more than 10 years. [17] This was an interim policy and was effective January 1, 1981. In July 1985, the OCC issued Revised Banking Circular 164, and the amortization of deposit base was mandatory.

Respondent contends that petitioner's assertion that the accounting rules of the OCC establish that deposit base is separable from goodwill is belied by the capital adequacy regulations of the OCC. The capital adequacy regulations provide that core deposit intangibles cannot be counted as primary capital because they lack the combination of separability, marketability, and certainty of cash-flow which would result in the support that a component of capital must be able to provide. The capital adequacy regulations reflect a concern with assets which can easily be sold. This is important to the OCC when deciding whether a particular asset provides a suitable liquidity cushion to a bank. Richard Shack, a senior accountant in the bank accounting division of the OCC,[18] testified that capital adequacy regulations and generally accepted accounting principles serve different purposes and that the exclusion of the core deposit

---

[17] The Securities and Exchange Commissioner's Staff Accounting Bulletin No. 42, "Application of Existing Accounting Standards to Business Combinations Accounted for by the Purchase Method Involving Financial Institutions" (Dec. 23, 1981), provides that any purchased identifiable intangible assets associated with the deposits of the acquired institution should be recorded at their estimated fair market values at acquisition. Par. 3, question 2. The identifiable intangible assets include mortgage escrow deposits, branch networks, mortgage servicing rights, customer base, deposit relationships, name in the marketplace, and earning capacity. Par. 3, question 1. An intangible asset whose fair market value is the present value of expected net interest margins to be earned from other purchased deposits normally should be amortized on an accelerated basis over a period which reflects the pattern of the expected runoff of the related deposits. Par. 3, question 3.

[18] The bank accounting division of the OCC establishes the accounting policies that banks will follow and interprets generally accepted accounting principles as applicable to banks.

intangible from regulatory capital for capital ratio purposes is irrelevant in determining whether the core deposit intangible is an amortizable asset for purposes of income accounting.[19] Furthermore, the OCC issued Revised Banking Circular 164, which required the amortization of deposit base, in July 1985 after the issuance of the capital adequacy regulations in March 1985.

Petitioner next contends that deposit base is separate and distinct from goodwill because there are reliable techniques for determining its value. As the evidence in this case indicates, an asset may be valued by at least three techniques—discounted future income, comparable market sales, and cost savings. Petitioner utilized the discounted future income method for valuing deposit base.

Petitioner asserts that pure deposit assumption transactions, i.e., assumption of deposit liabilities by an acquiring bank without acquisition of assets other than the deposited funds, frequently occur with respect to failing banks. As previously mentioned, Brown testified that petitioner had bid for such deposits although it had not been a successful bidder. Petitioner concludes that these transactions are significant in that they demonstrate that separate sales of deposit base do occur, even if not sufficient in frequency and comparability to provide the most appropriate basis for determining the value of deposit base in the instant case.

Petitioner also asserts that deposit base can be valued using the cost savings methodology. This technique measures the difference between the cost of owning a particular asset and the cost of owning the next most favorable market alternative.

The evidence in the instant case establishes that the acquisition of core deposits was the primary reason petitioner purchased the Acquired Banks and that petitioner paid a premium in order to obtain the core deposits. In *Banc One Corp. v. Commissioner, supra* at 490, we stated that "Often the assumption of the deposit liabilities, rather than the purchase of the assets, represents the economic

---

[19]Shack testified that the core deposit intangible was not the only way in which the capital adequacy regulations differed from generally accepted accounting principles. For example, the allowance for loan losses, which is an expense under generally accepted accounting principles, is added back to capital for purposes of determining capital adequacy.

purpose behind the acquisition of a bank."[20] These core deposits are a low-cost source of funds and are an important factor contributing to the profitability of a commercial bank.[21] Moreover, the economic value attributable to the opportunity to invest the core deposits can be valued. The value is based solely upon the core deposits acquired in the purchase. The fact that new accounts may be opened as old accounts are closed does not make the deposit base self-regenerative. See *Computing & Software, Inc. v. Commissioner,* 64 T.C. at 236. The new accounts which were opened subsequent to the acquisitions are not in dispute. Furthermore, the value of deposit base does not depend upon a vague hope that customers will patronize the bank for some unspecified length of time in the future. Benston states in his expert report that bank customers incur costs in establishing a deposit relationship[22] and that once a deposit account is opened, it tends not to be moved to another bank as long as the physical location of the

---

[20]In *Southern Bancorporation, Inc. v. United States,* 732 F.2d 374 (4th Cir. 1984), the taxpayer was approached by the Federal Deposit Insurance Corp. (FDIC) to participate in a bailout of a troubled financial institution. In computing its bid, the taxpayer included a premium of $5,560,000 calculated as approximately 5 percent of the total deposits of the troubled institution. The FDIC accepted the taxpayer's bid. The taxpayer subsequently attempted to allocate $4,993,940 of the premium to the loan portfolio of the troubled institution. The court held that the taxpayer's attempt to increase the bases of the loan portfolios was wholly post hoc. The court held that the taxpayer did not introduce sufficient evidence to establish the increased value of the loan portfolio. *Southern Bancorporation, Inc. v. United States, supra* at 377-378. The court observed that:

"It was the on-going use of that deposit base of $112,000,000, located in the 29 branches, as a source from which to make profitable loans which made the branches things of value to SBC. Hence, the value of the 29 branches, or, more especially, of the deposits of their customers, constituted a paramount consideration in SBC's calculation of the premium it would offer." [2] [*Southern Bancorporation, Inc. v. United States, supra* at 376.]

"[2]The record is devoid of any basis for establishing an amortization rate applicable to the premium based on the expected life of the accounts involved. *Cf. Midlantic National Bank v. Commissioner,* 46 TCM 1464 (1983). SBC's complaint raised, as an alternative ground for relief, the issue of amortizing the deposit base. However, SBC did not pursue the issue at trial and prove its alternative allegations that it paid $4,202,361 for the deposit base, and that the deposit base had a useful life of less than ten years."

[21]In *Midlantic National Bank/Merchants v. Commissioner, supra,* we stated that, "In the commercial banking industry deposit relationships represent the most favorable source of funds and are one of the most important factors with respect to the profitability of a commercial bank."

[22]Bank customers must decide which bank offers them the best package of services, convenience, and explicit returns and costs, then fill out the necessary documents and purchase checks. These often are called "transaction costs." Customers also may find it desirable to become known to the bank officers who evaluate their credit standing and who can provide them with regular and special services. These are called "information costs." All or some of these costs must be incurred each time a depositor opens an account at a different bank.

customer and the bank are unchanged, and as long as the customer is not very dissatisfied with the service or prices of the bank. He referred to this reluctance of customers to change banks as "inertia." The value of deposit base rests upon the ascertainable probability that inertia will cause depositors to leave their funds on deposit for predictable periods of time. We conclude that deposit base has an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the Acquired Banks. We must next examine whether petitioner has established that deposit base has a limited useful life, the duration of which can be ascertained with reasonable accuracy.

A taxpayer may establish the useful life of an asset for depreciation based upon his own experience with similar property, or, if his own experience is inadequate, based upon the general experience in the industry. Sec. 1.167(a)-1(b), Income Tax Regs. The taxpayer need only establish a "reasonable approximation" for depreciation. *Burnet v. Niagara Falls Brewing Co.*, 282 U.S. 648, 655 (1931). "Extreme exactitude in ascertaining the duration of an asset is a paradigm that the law does not demand." *Houston Chronicle Publishing Co. v. United States*, 481 F.2d at 1253-1254.

The useful life of an asset must be based upon facts existing as of the close of the taxable year in issue. *Southern Bancorporation, Inc. v. Commissioner*, 847 F.2d 131 (4th Cir. 1988), affg. a Memorandum Opinion of this Court; Banc One Corp. v. Commissioner, supra at 499. Evidence of petitioner's subsequent experience, however, is acceptable to corroborate its projections. *Super Foods Services, Inc. v. Commissioner*, 416 F.2d at 1240; *Banc One Corp. v. Commissioner, supra* at 501.

In the instant case, petitioner conducted lifing studies to determine the useful life of the acquired deposit accounts. Petitioner gathered data on account closings at each of the Acquired Banks for periods ranging from 3 months to 13 months immediately prior to the acquisition date. Petitioner based its studies upon the actual experience with regard to all accounts of the Acquired Banks rather than upon a sample. By analyzing the data, petitioner produced separate runoff tables for the DTA, regular savings, and TDOA accounts of each of the Acquired Banks.

runoff tables for the DTA, regular savings, and TDOA accounts of each of the Acquired Banks.

Petitioner engaged Dr. Thomas Doerfler, chief statistician of the management analysis section at Arthur D. Little, Inc., to conduct an independent lifing analysis and to estimate the survival rates of the acquired DTA, regular savings, and TDOA accounts at each of the Acquired Banks. Doerfler has a Ph.D. degree in statistics from Iowa State University and has performed numerous lifing studies. Doerfler took into account historical data up to the time of the acquisitions and used an analytical method based upon probability theory to estimate the remaining life of the acquired core deposits. Doerfler's lifing analysis projected that the following percentages of the DTA, regular savings, and TDOA accounts acquired from all of the Acquired Banks (other than the DTA accounts acquired from the Hart Bank) would remain open at the following dates:

| Date | Percentage |
|------|------------|
| 12/31/83 | 68.3 |
| 12/31/84 | 56.9 |
| 12/31/85 | 48.1 |
| 12/31/86 | 41.1 |
| 06/30/87 | 38.1 |

Doerfler concluded his report as follows:

> In conclusion, it is my opinion that the analytical methods described here support the contention that these deposit bases have a well-defined life, and exhibit predictable decay rates, both of which can be estimated in an objective manner that is consistent with sound statistical practices.

Doerfler testified that petitioner's lifing analysis was competent, objective, and intuitively sound. He further testified that petitioner's analysis was consistently applied, and derived reasonable and sound estimates of decay.

Petitioner also conducted a followup study of the actual closures of acquired accounts as of December 31, 1983, 1984, 1985, 1986, and June 30, 1987. The following table compares the percentages of accounts (other than the DTA accounts acquired from the Hart Bank) which petitioner projected to remain open, which Doerfler projected to remain open, and which actually remained open at the following dates:

| Date | Petitioner's projections | Doerfler's projections | Actual |
|------|------|------|------|
| 12/31/83 | 67.3 | 68.3 | 67.1 |
| 12/31/84 | 56.1 | 56.9 | 52.0 |
| 12/31/85 | 47.3 | 48.1 | 41.9 |
| 12/31/86 | 39.2 | 41.1 | 35.2 |
| 06/30/87 | 32.7 | 38.1 | 31.4 |

This comparison shows that petitioner's projections were substantially the same as Doerfler's projections which were calculated using statistical analysis. This comparison also shows that the validity of petitioner's projections was corroborated by the actual closures.

Respondent contends that petitioner did not measure the life of the deposit base. Respondent argues that petitioner focused on the wrong thing when it focused on the number of accounts and not the balances of the accounts. The value to petitioner of the deposit base is in the amount of deposit funds available for investment. These investable balances were determined by multiplying the percentage of accounts projected to survive each year by the balances of the accounts at the acquisition dates. Respondent argues, however, that there is no correlation between the number of accounts remaining open and the amount of deposit funds available for investment. Respondent, in effect, argues that just because 80 percent of the accounts remain open, it does not necessarily follow that 80 percent of the deposit funds remain. Respondent points out that while the number of accounts decreased, the impairment studies show that the aggregate balances in the open accounts remained high and declined at a slower rate than projected.

It is important to realize that petitioner's deposit base valuation methodology did not take into account a growth factor. In response to the criticism of respondent, petitioner, in its reply brief, took the actual balances of the acquired accounts on each of the impairment study dates and deflated them by the rate of increase in M2,[23] a measure of

[23]M2 measures the (1) currency outside the Treasury, Federal Reserve Banks, and the vaults of commercial banks, (2) traveler's checks of nonbank issuers, (3) demand deposits at all commercial banks other than those due to domestic banks, the U.S. Government, and foreign banks and official institutions, less cash items in the process of collection and Federal Reserve float, (4) negotiable order of withdrawal (NOW) and automatic transfer service accounts at banks and thrift institutions, credit union share draft accounts, and demand deposits at mutual savings banks, and (5) savings and small-denomination time deposits at all depository institutions, overnight repurchase agreements at commercial banks, overnight Eurodollars held

the money supply published in the Federal Reserve Bulletin.[24] After this adjustment, the aggregate balances in the open accounts are approximately the same as the aggregate balances projected by petitioner as shown by the following table (in thousands):

| Date | Projected Amount | Projected Percentage | Actual Amount | Actual Percentage | Adjusted Amount | Adjusted Percentage |
|---|---|---|---|---|---|---|
| Acquisition | $187,507 | 100 | $187,507 | 100 | $187,507 | 100 |
| 06/83 | 143,813 | 76.7 | 161,748 | 86.3 | 144,692 | 77.2 |
| 06/84 | 119,397 | 63.7 | 150,727 | 80.4 | 125,301 | 66.8 |
| 11/85 | 93,631 | 49.9 | 129,708 | 69.2 | 96,565 | 51.5 |

This establishes that once a growth factor is considered, the percentage of accounts remaining approximates the percentage of funds remaining. The fact that petitioner did not consider a growth factor indicates the conservative nature of petitioner's approach.

Respondent objects to petitioner's use of the Federal Reserve Bulletin.[25] Respondent argues that it was not introduced into evidence and that it is not the proper subject of judicial notice by the Court. As to the propriety of the Court taking judicial notice of such information, petitioner does not cite any authority. Rule 201(b) of the

by U.S. residents other than banks at Caribbean branches of member banks and balances of money market mutual funds (general purpose and broker/dealer). 68 Federal Reserve Bulletin No. 7, A13 (July 1982).

M2, not seasonally adjusted, at the acquisition date of each Acquired Bank and at each of the impairment study dates, as reported in the Federal Reserve Bulletin was as follows (in billions of dollars):

| | Acquisition date | M2 at acquisition | M2 at 6/83 | M2 at 6/84 | M2 at 11/85 |
|---|---|---|---|---|---|
| Cobb Bank | 12/31/81 | 1829.4 | 2114.0 | 2273.4 | 2545.0 |
| Clayton Bank | 12/31/81 | 1829.4 | 2114.0 | 2273.4 | 2545.0 |
| Henry Bank | 12/31/81 | 1829.4 | 2114.0 | 2273.4 | 2545.0 |
| Houston Bank | 05/31/82 | 1888.8 | 2114.0 | 2273.4 | 2545.0 |
| Colquitt Bank | 08/31/82 | 1938.9 | 2114.0 | 2273.4 | 2545.0 |
| Dalton Bank | 09/01/82 | 1938.9 | 2114.0 | 2273.4 | 2545.0 |
| Hart Bank | 10/31/82 | 1971.8 | 2114.0 | 2273.4 | 2545.0 |
| Jackson Bank | 10/31/82 | 1971.8 | 2114.0 | 2273.4 | 2545.0 |
| Thomas Bank | 10/31/82 | 1971.8 | 2114.0 | 2273.4 | 2545.0 |

An adjustment factor is computed by dividing M2 at the acquisition date of each Acquired Bank by M2 at each impairment study date. Adjustment factors are computed separately for each Acquired Bank. The adjustment factors are multiplied by the actual remaining balances at each Acquired Bank on each impairment study date to compute the adjusted balances.

[24]McCollum testified that the increase in the balances of the acquired accounts was approximately the same as the increase in the balances of similar accounts of petitioner that it had not acquired.

[25]The Federal Reserve Bulletin is defined as the official organ of the Board of Governors of the Federal Reserve System. G. Munn & F. Garcia, Encyclopedia of Banking and Finance, at 360 (8th ed. 1983).

Federal Rules of Evidence governs the types of facts of which judicial notice can be taken and provides that:

(b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Rule 201, Fed. R. Evid., has been construed to permit judicial notice of long-term corporate Aaa bond interest rates as reflected in the Federal Reserve Bulletins. *United States v. 97.19 Acres, More or Less, Located in Montgomery, Washington, and Allegany Counties, Maryland,* 511 F. Supp. 565, 569 (D. Md. 1981). A State court in Texas has held that the discount rate on 90-day commercial paper in effect at a Federal Reserve bank is a proper subject for the taking of judicial notice by reference to appropriate Federal Reserve Bulletins. *Wagner & Brown v. E.W. Moran Drilling Co.,* 702 S.W.2d 760, 773 (Tex. Civ. App. 1986). Rule 201 of the Texas Rules of Evidence is derived verbatim from rule 201 of the Federal Rules of Evidence. *Wagner & Brown v. E.W. Drilling Co., supra.* We conclude that it is appropriate to take judicial notice of M2 as published in the Federal Reserve Bulletin. Fed. R. Evid. 201(b)(2).

Respondent next contends that petitioner did not consider deregulation and the new financial products which were available. It appears that the thrust of respondent's argument is that deregulation made the banking environment so unstable that no valid inference about the future behavior of accounts could be drawn from historical experience. Petitioner's followup study, however, shows that its projections of account lives were reasonably accurate.

Respondent next contends that petitioner failed to consider that funds which were withdrawn might have moved to other branches of petitioner. However, petitioner's followup study tracked accounts that transferred from the Acquired Banks into any of the branches of petitioner within the State. The actual closures, taking into account these transfers, were substantially the same as the projections of petitioner. This indicates that transfers to other branches were not material.

Respondent next contends that petitioner should have stratified the accounts by various criteria such as the size of the account and the type of account, i.e., personal or business. Petitioner classified the accounts at each of the Acquired Banks by account type, i.e., DTA, regular savings, and TDOA accounts. This created 27 categories. Petitioner then stratified by age the accounts in each category. This resulted in 363 categories. Petitioner calculated the probability that an account would remain open for a specified period of time for each of the 363 categories. Petitioner's projections were substantially the same as Doerfler's projections and were also corroborated by the actual closures. Petitioner's stratification of the accounts resulted in accurate projections. It appears that petitioner stratified the accounts based upon the factors which it considered reasonable and relevant to determine the lives of the accounts. We will not disregard petitioner's projections because respondent thinks they should have been stratified differently.

The evidence establishes that deposit accounts do not remain indefinitely with a bank but close for a variety of reasons. Although it is not possible to predict when a particular deposit account will close, it is possible to estimate the percentage of accounts that will close over a given period of time. To estimate the percentage of accounts that would close over a given period of time, petitioner conducted lifing studies. Doerfler testified that petitioner's lifing studies derived reasonable and sound estimates of decay. Moreover, the validity of petitioner's estimates was corroborated by the actual closures. Petitioner also established that there was a correlation between the percentage of acquired accounts remaining and the percentage of acquired funds remaining. We conclude, therefore, that deposit base has a limited useful life, the duration of which petitioner ascertained with reasonable accuracy. Thus petitioner has established the two elements necessary in order to qualify for a depreciation deduction with respect to deposit base. We must next consider petitioner's valuation of the acquired deposit base.

Petitioner utilized the lifing analysis as a basis for calculating the value of the deposit base. The survival probabilities determined by the lifing analysis were multi-

plied by the balances of each age group of accounts to project the investable balances. These balances were then multiplied by a spread rate to determine the net income stream. The final step was to discount the net income stream to present value. Petitioner calculated a value of $41,785,070 for deposit base.

Petitioner engaged Robert Curtis, a vice president with Arthur D. Little Valuation, Inc., to conduct an independent valuation of the acquired deposit base. Curtis is an experienced consultant to the banking industry and has been personally involved in deposit base valuations for more than 60 different clients. Curtis has a master's degree from the Wharton Graduate School of Finance, University of Pennsylvania.

Curtis valued the deposit base of the Acquired Banks by projecting the net balances of the acquired accounts that would be available for investment in future years, forecasting the net income stream that would be derived from those net investable balances, and discounting that net income stream to present value. Curtis used the lifing analysis of Doerfler as the basis for the valuation. The valuation utilized the discounted future net income method because it is required by the OCC and is the most commonly used method in valuing intangible assets. Curtis' methodology was generally similar to that employed by petitioner, but assumed that the balances of the existing accounts would grow at an annual inflation rate of 5 percent. On a pre-tax basis, Curtis calculated a value of $46,797,000 for the acquired deposit base. He calculated an after-tax value, assuming an effective tax rate of 20 percent, of $44,188,000 for the acquired deposit base. Curtis testified that in his expert opinion the fair market value of deposit base is most closely approximated by the after-tax value calculated by using the discounted future net income method assuming an effective tax rate of 20 percent because that rate conformed to banking industry experience in the relevant period.

Curtis also valued deposit base using a cost savings methodology. This methodology measures the value of an asset as the present value of the difference between the ongoing cost of the asset and the cost of the market alternative. Curtis testified that the cost savings approach

is specifically designed to represent a floor value. Curtis compared the cost of core deposits with the cost of insured certificates of deposit because insured certificates of deposit are the most realistic alternative to core deposits and are comparable in terms of average balance size, maturity or remaining life, and insurability. Curtis calculated a pre-tax value of $38,204,000 under the cost savings approach. The after-tax value, assuming an effective rate of 20 percent, was $36,078,000.

Petitioner contends that Curtis' valuation confirms the reasonableness of its valuation of deposit base. Petitioner also points out that the OCC reviewed its valuation and approved the recording of the deposit base on the books of petitioner in the amount determined by petitioner. Shack testified that he was responsible for reviewing core deposit studies and that OCC approval reflected the considered judgment of the OCC that the amount recorded was reasonable.

Respondent contends that petitioner and Curtis failed to consider the shift in funds from non-interest-bearing checking accounts to the more attractive products which would be available after deregulation. Respondent asserts that such a movement of funds would cause a decline in the balances of the core deposits available for investment. Petitioner's impairment studies, however, show no unanticipated decline in the balances of the core deposit accounts. In fact, after a growth factor is considered, the balances in the accounts are approximately the same as the balances projected by petitioner. Furthermore, respondent's argument is inconsistent with his argument that the aggregate balances in the open accounts remained high and declined at a slower rate than projected.

McCollum testified that the foreseeable effect of deregulation at the time of the acquisitions was largely in the area of NOW accounts. He further testified that the other effects of deregulation which were foreseeable at the time of the acquisitions did not appear to have an impact on the type of accounts being valued. According to McCollum, NOW accounts were "well entrenched" at the time of the acquisitions. In petitioner's deposit base valuation methodology, the ratio of NOW account balances to total DTA balances

was determined at each Acquired Bank. Petitioner determined a separate overhead expense rate, interest rate, and float rate applicable to acquired NOW account balances. Petitioner computed a weighted average spread rate for DTA accounts based upon the separate spread rates for demand A deposits and NOW accounts and weighted by the balances in those two account groups. Thus, petitioner assumed that NOW account balances would constitute the same percentage of total DTA account balances as they constituted at the date of valuation.

The following table shows that the ratio of NOW account balances to total DTA account balances at the six Acquired Banks acquired in 1982 remained relatively constant:

| Year | Percentage |
|---|---|
| At valuation | 25.4 |
| 1983 | 24.8 |
| 1984 | 26.9 |
| 1985 | 28.2 |
| 1986 | 29.6 |

Respondent argues that the table is misleading as it does not include the Cobb, Clayton, and Henry Banks, which were the largest and most significant banks.[26] Respondent argues that the shift to NOW accounts would have been more dramatic in these banks because they were in the metropolitan Atlanta area where accounts had larger balances. Respondent asserts that the more sophisticated and affluent urban customers would presumably have switched to NOW accounts as soon as they were available. Petitioner points out, however, that if this were the case then the switch to NOW accounts at these banks would have occurred when the NOW accounts were first introduced. Thus respondent's argument supports McCollum's testimony that NOW accounts were "well entrenched" at the time of the acquisitions and confirms the reasonableness of petitioner's assumption that NOW account composition at the time of the acquisitions would be representative of future periods. Although the table only deals with six of the Acquired Banks and, therefore, is not conclusive, it certainly gives credence to petitioner's assumption.

---

[26]Rhonda Pawelski, an assistant vice president in petitioner's comptroller's department, testified that it was not possible for petitioner to prepare a summary for the Cobb, Clayton, and Henry Banks because separate subsystem ledgers were not maintained for those banks.

Respondent also asserts that deregulation made interest rates unstable. The maximum interest rate payable on regular savings accounts remained at 5.25 percent until January 1984, when it increased to 5.5 percent.[27] Kane testified that he would not be surprised if petitioner's interest rate remained at 5.5 percent after the limit was removed in 1986.[28] Petitioner paid approximately the same interest rate on regular savings accounts and TDOA accounts. The evidence thus indicates that the interest rates paid on interest-bearing core deposits were stable.

Respondent next contends that petitioner has allocated the purchase price to the earning assets twice. In allocating the purchase price, petitioner valued the loans and securities of the Acquired Banks based upon the present value of the income stream they were expected to generate. Petitioner then calculated the value of deposit base as the present value of the income stream the purchased core deposits were expected to generate. A portion of the purchase price was then assigned to these assets based upon the values determined. Petitioner's valuation of deposit base assumes, in effect, that all of the core deposits were immediately available for investment. However, petitioner could only invest the core deposits which were already invested in securities or dispersed as loans when the securities were sold or the loans were repaid. Petitioner made no adjustment for the fact that a portion of the core deposits was invested in assets which it had previously valued.[29]

In a sensitivity analysis of the computerized acquisition model for the Cobb Bank, petitioner replaced the acquired core deposits that were projected to survive in each future year with more expensive money market liabilities. This reduced the recommended purchase price of the model from $21.1 million to $5.6 million, a reduction of $15.5 million. Petitioner contends that the $15.5 million is the portion of the purchase price projected by the acquisition model which is attributable to the acquired deposit base. Petitioner points out that by way of comparison, McCollum deter-

---

[27]See 48 Fed. Reg. 50068 (Oct. 31, 1983).

[28]See 51 Fed. Reg. 9767 (Mar. 21, 1986).

[29]We do not understand respondent to argue that a portion of the premium was attributable to the loans and securities having a fair market value in excess of their book value.

mined that the value of the acquired deposit base for the Cobb Bank was $14,463,683. The sensitivity analysis, however, measured the difference in costs between core deposits and the more expensive money market liabilities. This reveals that when petitioner calculated the offering prices, that portion of the price which was a premium for the core deposits was attributable to the difference in costs between the core deposits and the market alternative. The basis for depreciation deductions is cost, not value. Secs. 167(g), 1011, 1012. Cost is what petitioner paid for the asset. *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d at 683-684. We conclude, therefore, that petitioner is entitled to allocate to deposit base an amount equal to the present value of the difference in costs between the acquired core deposits and the market alternative.[30] In accordance with the written report and testimony of Curtis concerning the cost savings methodology, petitioner is entitled to allocate $34,959,411 to deposit base and it is allocated to the Acquired Banks as follows:

| Acquired Bank | Deposit base |
| --- | --- |
| Cobb Bank | $12,720,000 |
| Clayton Bank | 7,273,000 |
| Henry Bank | 954,000 |
| Houston Bank | 4,808,000 |
| Colquitt Bank | 2,366,000 |
| Dalton Bank | [31]667,411 |
| Hart Bank | 2,459,000 |
| Jackson Bank | 1,484,000 |
| Thomas Bank | 2,228,000 |
| Total | 34,959,411 |

Petitioner used the residual method of valuation to value goodwill and going-concern value.[32] Respondent agrees that this is proper. Under this method, the value of goodwill and going-concern value equals the difference between the total purchase price and the value of the other known assets.

[30]Our conclusion disposes of respondent's argument that petitioner allocated the purchase price to the earning assets twice.

[31]Curtis' report actually calculated a value of $1,786,000 for the deposit base of the Dalton Bank. However, the value is limited to $667,411, because this was all of the purchase price remaining after its allocation to the other assets. This difference accounts for the difference between the total amount calculated by Curtis using the cost savings methodology, $36,078,000, and the amount petitioner is entitled to allocate.

[32]Sec. 1060, enacted by sec. 641(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2282, makes the residual method of valuation mandatory for acquisitions after May 6, 1986, unless entered under a binding contract in effect on that date and at all times thereafter.

*Banc One Corp. v. Commissioner,* 84 T.C. at 502-503; *Solitron Devices, Inc. v. Commissioner,* 80 T.C. 1, 20-22 (1983), affd. without published opinion 744 F.2d 95 (11th Cir.1984); *Florida Publishing Co. v. Commissioner,* 64 T.C. 269, 280 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977). The primary virtue of the residual method is in obtaining a more accurate valuation of the acquired intangibles without making speculative assumptions and engaging in unnecessarily complex computations. *Banc One Corp. v. Commissioner, supra* at 506. The total purchase price for the Acquired Banks was $461,635,024,[33] of which $409,353,582 is not in dispute. Of the remaining $52,281,442, we have concluded that deposit base has a value of $34,959,411. Thus, the excess of the total purchase price over the aggregate values of all the other known assets, i.e., the value of goodwill and going-concern value is $17,322,031 and is allocated to the Acquired Banks as follows:

| Acquired Bank | Goodwill/going-concern value |
|---|---|
| Cobb Bank | $5,830,471 |
| Clayton Bank | 2,550,692 |
| Henry Bank | 1,077,811 |
| Houston Bank | 326,828 |
| Colquitt Bank | 2,558,420 |
| Dalton Bank | - - - |
| Hart Bank | 2,517,994 |
| Jackson Bank | 938,974 |
| Thomas Bank | 1,520,841 |
| Total | 17,322,031 |

The use of the residual method results in an allocation of zero to goodwill and going-concern value with respect to the Dalton Bank. Respondent maintains that this is incorrect as a matter of law. To support his contention that some amount must be allocated to goodwill and going-concern value as a matter of law, respondent cites *Commissioner v. Seaboard Finance Co.,* 367 F.2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court. In that case, the taxpayers purchased a loan business for a consideration in excess of the face amount of the loan contracts and value of

---

[33]Respondent does not contend that the purchase price was not the result of arm's-length negotiations or that it was not representative of fair market value.

the other assets. The Government argued that the entire premium was attributable to goodwill and going-concern value. The taxpayers contended that the premium was paid solely for the loan accounts. We held that the question is purely one of fact to be determined from the evidence presented. Applying the principle announced in *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), we held that 70 percent of the premium was attributable to the loan contracts and 30 percent of the premium was attributable to goodwill and going-concern value of the loan businesses acquired. On appeal, the Government did not challenge the allocation. We do not read *Commissioner v. Seaboard Finance Co., supra,* as supporting the proposition that zero allocations to goodwill and going-concern value are incorrect as a matter of law. Accordingly, we reject the contention of respondent.

The remaining issue for our decision is whether the depreciation claimed by petitioner with respect to deposit base was reasonable. Section 167(a) provides for the deduction of a "reasonable allowance" for depreciation.[34] Section 167(c) indicates that the straight-line method, listed in section 167(b)(1), is the only method available with respect to depreciation of intangibles. However, the depreciation of intangibles is not limited to the straight-line method if petitioner can show that another method results in a more reasonable depreciation allowance. *Computing & Software, Inc. v. Commissioner,* 64 T.C. at 237-238. A method other than straight-line is appropriate when, considering the facts of the case, it "results in a fair allocation of the basis of the asset to periods in which income is realized." *Schneider v. Commissioner,* 65 T.C. 18, 32 (1975).

Petitioner refers us to one Revenue Ruling and two cases to illustrate that methods other than straight-line are applicable to intangibles when use of the straight-line method would not result in a reasonable allowance for depreciation.

In Revenue Ruling 60-358, 1960-2 C.B. 68, respondent recognized the difficulties associated with depreciating film

---

[34]The Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 221, enacted sec. 168, which provides depreciation rules for most tangible personal property placed in service after Dec. 31, 1980.

contract rights. Because of the uneven flow of income earned by this type of property, and because the usefulness of such assets is best measured by the flow of income and not solely by the passage of time, respondent accepted the income-forecast method as a method of depreciation under section 167.[35] Pursuant to this method, an estimate of income to be derived from the contracts is calculated, and in each year the taxpayer may depreciate that part of his basis which bears the same ratio to the total basis as the payments received in the year bear to the total estimated payments.

In *KIRO, Inc. v. Commissioner*, 51 T.C. 155 (1968), we allowed package film contract costs to be amortized using a "sliding scale" method. The taxpayer was allowed to depreciate the contract costs based upon the number of times the films were run, with 60 percent of the costs being deducted after the first run. We justified the application of this accelerated method upon the grounds that the method "coincides with the evidence and with the 'facts of life' of the television industry." *KIRO, Inc. v. Commissioner, supra* at 170.

In *Union Bankers Insurance Co. v. Commissioner*, 64 T.C. 807 (1975), the taxpayer showed that the reinsurance assumptions it purchased had an average useful life of 7 years or less and that at least 20 percent would be lost in the first year. We allowed the taxpayer to take a 20-percent depreciation deduction in the first year and to depreciate the remaining 80 percent ratably over the remaining 6 years. We justified such depreciation upon the basis of the factual showing that at least 20 percent of the contracts would be lost in the first year.

In the instant case, petitioner claimed a depreciation deduction of $9,250,982 with respect to deposit base for the taxable year 1982. This amount is equal to the present value on the acquisition dates of the Acquired Banks of the projected net income from the acquired deposit accounts

---

[35]The ruling explicitly states that the income forecast method is "limited in its application to television films, taped shows for reproduction and other property of a similar character." In Revenue Ruling 64-273, 1964-2 C.B. 62, respondent authorized the use of the income forecast method with respect to motion picture films. The application of the income forecast method has been approved by this Court in several cases, all of which involved films. *Abramson v. Commissioner*, 86 T.C. 360 (1986); *Greene v. Commissioner*, 81 T.C. 132 (1983); *Wildman v. Commissioner*, 78 T.C. 943 (1982); *Schneider v. Commissioner*, 65 T.C. 18 (1975).

during 1982. For 1983 and later years, the amount of depreciation is equal to the present value on the acquisition dates of the projected net income stream for the taxable year. In light of our holding that petitioner is entitled to allocate to deposit base the present value of the difference in costs between the acquired core deposits and the market alternative, petitioner's depreciation deduction would be calculated based upon the present value on the acquisition dates of such difference for the taxable year.

Respondent points out that McCollum testified that the amortization method used for financial reporting purposes was "theoretically correct." The statute, however, does not require the most "theoretically correct" method, but a reasonable allowance. Petitioner contends that its tax method provides a reasonable allowance.

Petitioner contends that its tax method of depreciation coincides with the evidence and the facts of life in the banking industry. The evidence establishes that deposit base declines rapidly in value during the years immediately following acquisition because of the pattern of account closures and because of discounting. Petitioner's expert, Curtis, stated in his report as follows:

The erosion of deposit base is accelerated; that is, there is a substantial drop off in accounts/balances in the early years which becomes less pronounced in the later years. Accordingly, the decline in income [cost savings] derived from the deposit base also is accelerated in the early years. This effect is compounded when the present value of the income stream [cost savings] is considered.

The amount of depreciation is equal to the present value on the acquisitions dates of the projected cost savings for the taxable year. Thus, petitioner's method is based upon the contribution the current year's cost savings made to the value of deposit base. We conclude that petitioner's tax method of depreciating deposit base results in a fair allocation of the basis of the asset to periods in which benefit is realized and provides petitioner a reasonable allowance for depreciation.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

KÖRNER, SHIELDS, HAMBLEN, CLAPP, SWIFT, WELLS, and WHALEN, *JJ.,* agree with the majority opinion.

NIMS and RUWE, *JJ.,* did not participate in the consideration of this case.

---

COHEN, *J.,* concurring: The majority opinion concludes that (1) the "deposit base" that petitioner purchased when it acquired smaller banks has an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the acquired banks; (2) petitioner established that deposit base has a limited useful life, the duration of which can be ascertained with reasonable accuracy; (3) using the cost savings method of valuation, petitioner is entitled to allocate to deposit base an amount equal to the present value of the difference in cost between the acquired core deposits and the market alternative (i.e., the next cheapest source of borrowed funds needed by petitioner to conduct its banking business); and (4) petitioner is entitled to an amortization deduction under section 167 for the year in issue in an amount equal to the present value on the acquisition dates of the difference in cost between the acquired core deposits and the market alternative.

The dissenting opinion of Judge Williams asserts that the majority commits *legal* error in ignoring the relationship between core deposits and customer business in applying the requirement that intangibles must be "separate and distinct" from goodwill if they are to be amortized. His disagreement is with the majority's "willingness to accept the opportunity to arbitrage as the *only* value attributable to the core deposits."

In a number of prior cases, respondent has prevailed because of a taxpayer's failure to establish the facts found by the majority in this case. Yet, Judge Williams cites, and I have found, no authority for the proposition that assets, intangible or tangible, are not separate and distinct from goodwill unless no part of their value is related to continued patronage of customers of an ongoing business. As the majority opinion demonstrates in its exhaustive analysis of

relevant authorities, assets are frequently found to be eligible for amortization even though the price paid took into account the probable continuance of terminable business relationships. See majority opinion at pp. 481-489 and, e.g., *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1246-1247 (5th Cir. 1973); *Super Food Services, Inc. v. United States,* 416 F.2d 1236, 1240 (7th Cir. 1969); *First Pennsylvania Banking & Trust Co. v. Commissioner,* 56 T.C. 677, 686-688 (1971); *Manhattan Co. of Virginia, Inc. v. Commissioner,* 50 T.C. 78, 90-91 (1968); *Business Service Industries, Inc. v. Commissioner,* T.C. Memo. 1986-86. Tangible property, such as special purpose equipment, is unquestionably subject to depreciation even though its value may be enhanced by its use in an ongoing business. It seems to me that the requirement that an asset be separate and distinct means only that it must have a measurable value for a specific use. That is what petitioner has established in this case.

Judge Williams also disagrees with the majority's determination of limited useful life and the amount of amortization available to petitioner. He states that petitioner has not presented "adequate proof" of the useful life of the core deposits and that the amount claimed by petitioner is unreasonable. The code, regulations, and cases require only that the period be "estimated with reasonable accuracy" and that the amount claimed be a "reasonable allowance" for the exhaustion of the property. Sec. 167; sec. 1.167(a)-3, Income Tax Regs. *Houston Chronicle Publishing Co. v. United States, supra* at 1252-1253. The nature of estimates for depreciation or amortization is that they constitute only a "reasonable approximation"; absolute certainty is not required. Hindsight evidence based on actual experience repeatedly has been rejected as a basis for computing depreciation. See cases cited in *Banc One Corp. v. Commissioner,* 84 T.C. 476, 499-501 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987). Similarly, hindsight evidence does not discredit approximations that were reasonable when made. Depreciation is frequently based on assumptions of useful life and rates of exhaustion that appear arbitrary when compared to actual experience.

The evidence in this case persuaded the fact finder that petitioner's method of amortization was justified. I believe that the standards that Judge Williams suggests as prerequisites to deductions for amortization of core deposits have not been applied in any case and would be unreasonably stringent in view of the nature of amortization or depreciation deductions.

KÖRNER, HAMBLEN, WELLS, and WHALEN, *JJ.*, agree with this concurring opinion.

----

JACOBS, *J.*, concurring: I have difficulty understanding how petitioner was able to prove that the core deposits have (1) an ascertainable cost basis separate from that of the goodwill of the acquired banks, and (2) a limited useful life, the duration of which can be determined with reasonable certainty. Nonetheless, petitioner did. Not being the trier of the facts in this case, I do not wish to, and shall not, substitute my judgment for that of the trial judge. Based on the factual predicate that the core deposits have an ascertainable cost basis separate from goodwill and that the core deposits have a determinable useful life, I am bound to concur with the result reached herein.

PARKER and WRIGHT, *JJ.*, agree with this concurring opinion.

----

CHABOT, *J.*, dissenting: The majority conclude that petitioner acquired an asset called "deposit base", and permit petitioner to depreciate the cost of this asset. The majority describe this asset as follows (majority opinion at 465):

Petitioner uses the term "deposit base" to describe the intangible asset that arises in a purchase transaction representing the present value of the future stream of income to be derived from employing the purchased core deposits of a bank. Petitioner uses the term "core deposits" principally to refer to deposit transaction accounts (DTA accounts), regular savings accounts, and time deposit open accounts (TDOA accounts). * * *

The majority apparently accept petitioner's artful set of definitions and the label "asset". I would hold that there is no such separate asset, and so I respectfully dissent.

By petitioner's admission, the so-called "core deposits" are not customers' deposits (i.e., the cash and other assets that the customers deposited). Instead the core deposits are the customers' accounts, which are petitioner's obligations to repay its customers under the terms applicable to those accounts. Thus the "core deposits" are *liabilities*, and not assets.

For reasons rooted in economics, governmental regulations, and mass psychology, many bank customers maintain accounts at banks at interest rates below the market rates of earnings that those customers could have obtained by making different investments. Realistically, such liabilities are worth less than face. Petitioner (and evidently the banking community generally) recognizes this phenomenon and has developed an approach to quantify it.

When petitioner bought the Acquired Banks, it did so in transactions that amounted to taxable asset purchases. Petitioner also assumed liabilities of the Acquired Banks. (Majority opinion at 468.)

Evidently, petitioner valued the Acquired Banks' assets, including goodwill, and offset this by the liabilities that petitioner was agreeing to assume. The result of petitioner's analysis as described in the Findings of Fact is that petitioner agreed that the value of the Acquired Banks' assets should not be offset by the face of the liabilities, but rather by a lesser amount—an amount which is in effect the then-current fair market value of the liabilities.

As a result, petitioner paid a premium. That premium should be allocated among the assets whose earning power has been enhanced because the offsetting liabilities are worth less than face. This would account for the reality that petitioner paid a premium, that the premium was for assets with earning power,[1] and that the statute we purport to apply[2] allows depreciation deductions as to "property".

---

[1] One would hardly expect petitioner to pay a premium for "deposit base" or "core deposits" in the absence of cash, securities, realty, leases, etc.

[2] Sec. 167(a) provides, in pertinent part, as follows:

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable

Respectfully, I suggest that a taxpayer's liability to its customers is not that taxpayer's "property" within the meaning of section 167(a).

---

WILLIAMS, *J.*, dissenting: I respectfully dissent. Despite the majority's prodigious attempt to distinguish the weight of authority, it commits an error in law by holding that an intangible asset that can be described and valued in part must necessarily be "separate and distinct" from goodwill.

It is indisputable that the asset that petitioner depreciated includes the opportunity to arbitrage the funds labeled "core deposits." The "opportunity to invest," majority opinion at 499, low-cost funds at a higher rate of return is certainly valuable and measurable. As the majority recognizes, the value of that opportunity will fluctuate depending on (1) the level of available funds, (2) the cost of those funds, and (3) the differential between the cost of funds and the rate of return on investing those funds. To determine a value, therefore, one must be willing to accept as foundational several quixotic assumptions about the future performance of the money markets, the local and national economies, and depositors' preferences. See, e.g., majority opinion at 472, 496, 499. This willingness is the "factual" part of this case, and though I might not be as willing as Judge Goffe to accept those assumptions, as the trier of fact, he is entitled to deference unless his judgment is clearly erroneous.

My disagreement with the majority is not, however, over its willingness to validate the future predictions that petitioner's financial analysts made. My disagreement is with its willingness to accept the opportunity to arbitrage as the *only* value attributable to the core deposits.

Judge Goffe found that "core deposits are * * * reasonably stable over time and relatively insensitive to interest rate changes." Majority opinion at 465. He also found that "an integral part of [the assumptions used in the acquisition model that projected the banks' future financial perfor-

---

allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
    (1) of property used in the trade or business, or
    (2) of property held for the production of income.

mance] was that the balance sheet *growth* was going *to continue* to be funded to a large extent by core deposits." Majority opinion at 467, emphasis added. These two critical findings, viz, that the core deposits were stable and that they formed the heart of petitioner's projections of future financial success, suggest to me that the acquired deposits had more value than the discounted present value of the projected net income from their investment. That additional value was petitioner's entree into the local banking markets serviced by the Acquired Banks. In other words, that additional value was inextricably woven with "the expectancy that old customers will resort to the old place" of business—i.e., the Acquired Banks' goodwill. *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1247 (5th Cir. 1973). These findings also suggest to me that despite the majority's statement that the record here "is different from the record" in *AmSouth Bancorporation & Subsidiaries v. United States,* 681 F. Supp. 698 (N.D. Ala. 1988), the operative facts are not so different. The District Court in *AmSouth* correctly recognized that under the *Houston Chronicle* test, to amortize an intangible it must not only be identifiable, it must be separate and distinct.

It is legal error to ignore the relationship between core deposits and customer business, and, in my view, the majority has ignored it and has failed to apply the legal standard that the value of these deposits must be "separate and distinct" from goodwill. To be sure, petitioner paid for the right to arbitrage the cash on deposit, but just as surely in the same stroke it paid for the right to conduct the banking business with those depositors and for the opportunity to exploit goodwill generated by the Acquired Banks in their communities.

The majority's reasoning is as follows: (1) An important and valuable component of petitioner's business was the core deposits, (2) that value is the right to invest low-cost core deposits in higher returning investments, (3) the value can be measured; therefore, the value is separate and distinct from goodwill. It is a nonsequitur. Petitioner must demonstrate more than that some part of the value attributable to the core deposits can be measured; petitioner must show that that value is separate and distinct from the

opportunity to do business with those depositors. Simply because "the economic value attributable to the opportunity to invest core deposits can be valued" (majority opinion at 499), it does not follow that that is the only value of the core deposits or that that value is "separate and distinct from the goodwill and going-concern value of the Acquired Banks." Majority opinion at 500. The core deposits do not offer one business opportunity (investment) to the exclusion of the other (selling services). They represent both business opportunities, and one has no meaning without the other. Unless Judge Goffe can find as a fact in this case that core deposits presented petitioner with little opportunity to sell banking services to existing depositors or to attract new depositors, the majority has incorrectly concluded that *all* the value of the core deposits is represented by the arbitrage opportunity. Judge Goffe has made no such finding.

While petitioner has adequately described some part of the loaf of goodwill it acquired, petitioner paid not for part but for the whole. Perhaps if petitioner had acquired *only* the funds represented by the core deposits, it could have made its case. See *Midlantic National Bank/Merchants v. Commissioner,* T.C. Memo. 1983-581. In this case, however, petitioner purchased the whole asset—including the entree into the local banking business represented by the core deposits, i.e., goodwill. It can be said in this case as forcefully as it was said in *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 235 (1975), that "each of these purchases involved an ongoing business—an organization that was doing business and earning money; a network of customers and the expectation that their patronage would continue; a staff of employees trained in  * * *  dealing with the organization's customers;  * * * . Petitioners were able to continue to provide services to the customers of the acquired businesses without interruption because of the takeover. The portion of the price attributable to these factors is nondepreciable."

The majority attempts to diminish the importance of core deposits to the generation of future business by its conclusory statement that "The fact that new accounts may be opened as old accounts are closed does not make the

deposit base self-regenerative." Majority opinion at 499. It is undoubtedly true that new accounts do not spring to life from old ones. The issue, however, is whether new business is attracted by the relationship represented by those core deposits. The majority's failure to come to grips with this issue results from the majority's erroneous premise- that because some part of the value of the core deposits can be measured, core deposits are an asset isolated from overall banking business opportunities and specifically from the business plan for petitioner's acquisitions.

In short, the core deposits were critical to petitioner's ability to do business (sell services to existing customers) and to improve business (sell new services to existing and new customers) and were far more valuable to petitioner ("of paramount concern") in this case than the mere opportunity to arbitrage the funds. See majority opinion at 495. The Northern District of Alabama in *AmSouth Bancorporation & Subsidiaries v. United States*, 681 F. Supp. 698 (N.D. Ala. 1988), expressed these same points as follows:

> For accounting purposes, a bank may be able to "identify" a customer deposit base even though it may not be separate and distinct from goodwill. To the extent that deposits remain after some contractually stipulated period, they result from "continued patronage." The mere fact that the deposits themselves are identifiable, does not make their "value" separate and distinct from goodwill. Other facets of bank activities such as safe deposit "expectations," loan "expectations," etc. could perhaps be similarly "identified" so as to phase out the concept of goodwill. There is no indication that tax law permits or contemplates this result.

Moreover, were the majority correct that the only value to core deposits is the value ascribed to them, on an essential point the majority opinion does not require adequate proof of the useful life of the core deposits. The elaborate and sophisticated lifing and impairment studies conducted by petitioner focus on the number of accounts more than on the level of funds. The opportunity to arbitrage the funds, of course, depends less on the number of accounts existing than on the level of available funds. Perhaps the majority opinion recognizes this weakness in the lifing studies by accepting the petitioner's proffered "M-2 adjustment." See majority opinion 502-504. The

majority accepts this M-2 adjustment in rejecting the Government's observation that "the impairment studies show that the aggregate balances in the open accounts remained high and declined at a slower rate than projected." What the majority avoids, however, is giving any rationale for applying a macroeconomic measurement of currency to reduce available funds in the acquired core deposits. Petitioner itself did not use such an adjustment, I believe, as a result of correct financial and economic understanding and not as a result of "the conservative nature of petitioner's approach." Majority opinion at 503. Whether this adjustment is appropriate is a question which is not addressed by the majority. In the absence of any rationale, it appears to be unwarranted. In the absence of the adjustment, it does appear that the Government's observation is correct. The measured balances in the core deposits remained high, and this tends to undermine the reliability of petitioner's estimated useful life for core deposits.

Finally, the amount of the depreciation claimed by petitioner is unreasonable. Judge Goffe finds that "under the amortization method adopted by petitioner for financial accounting and regulatory accounting purposes, the amortization deduction in each year is equal to the difference between the present value of all projected future income streams at the beginning of the year and the present value of all projected future income streams at the end of the year." Majority opinion at 473. For 1982, the amount so determined was $5,486,830. Nevertheless, petitioner deducted $9,250,982—i.e., "the present value at the acquisition dates of the projected income stream for the taxable year." Majority opinion at 474. The majority accepts petitioner's contention "that its tax method of depreciation coincides with the evidence and the facts of life in the banking industry." Majority opinion at 514. The majority ignores, however, that neither financial accounting principles nor the Comptroller of the Currency permit such a liberal chargeoff against income despite the prevailing facts of life in the banking industry. Of course, neither financial accounting nor regulatory accounting are determinative for Federal income tax purposes because they serve different

and often divergent policy goals. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 541-544 (1979). Nevertheless, it is unclear why petitioner is entitled to claim the projected income stream as a deduction. If actual income were less than projected, the majority's rule could permit a greater tax benefit than if the income were treated simply as a return of capital and excluded from gross income. The majority has not given the reason. I am also puzzled by the majority's last-page transmutation of the projected income stream from arbitraging the core deposits into "projected cost savings." In particular, I do not believe there is any authority for permitting a deduction based on "cost savings."

WHITAKER, GERBER, and PARR, *JJ.,* agree with this dissent.